WARREN HUNT *vs.* BAY STATE IRON COMPANY & others.

Although iron rails are so fastened upon the road-bed of a railroad company as to be part of the realty in the absence of any agreement to the contrary, yet if the vendor delivered and the company received them under an agreement that they should be laid down on a specified part of the road and remain the vendor's property until paid for, and they have not been paid for, they continue to be personal property as between the vendor and the company; and also as between the vendor and subsequent incumbrancers and grantees of the railroad who had notice of the agreement when they acquired title; but not as between the vendor and prior mortgagees of the railroad, or owners of land over which the railroad was located and the iron was laid who remain entitled to possession of such land as security for their damages, unless they have consented to said agreement.

BILL IN EQUITY, filed in August 1863, by one of the guar-- antors of a certain promissory note of the Boston and New York Central Railroad Company, to compel the execution by Horatio N. Slater, one of the respondents, of a trust concerning certain iron rails laid down and fastened upon the road-bed of that rail- road company between Boston and Dedham, prior to January 1, 1855, and continuing so attached to the road-bed from that time to the time of bringing this bill; which trust was alleged to be raised by the following instrument executed by Slater on Sep- tember 18, 1854 :

" Whereas I have this day purchased of the Bay State Iron Company ten hundred and fifty-three tons of iron, paying therefor with the note of the Boston and New York Central Railroad Company, [for sixty-eight thousand four hundred and fifty-five dollars,] secured by thirty of their mortgage bonds, and also secured to the amount of forty thousand dollars of the per

sonal guaranty of [here followed a list of the guarantors]; and whereas the said Boston and New York Central Railroad Company have promised to pay to me five thousand dollars per month after the 1st day of March, A. D. 1855, out of the receipts of their said railroad, which sum, if received by me, I intend to apply to their said note given to me and by me sold to the Bay State Iron Company, the said five thousand dollars to be applied in part to reducing the guaranty of the said above named persons : Now, therefore, I hereby agree with the said guarantors that I will hold the said iron to indemnify them for all their liability as such guarantors, it being understood, however, that in consideration of the pledge of their receipts to me, I may either or both loan or sell said iron to said company to be used by them upon their said road.   In testimony whereof I have hereunto set my hand and seal this 18th day of September, A. D. 1854."

It was further alleged in the bill, and it appeared at the hearing, that on September 23, 1854, an agreement under seal was entered into between Slater and the railroad company, in pursuance of which the iron thus bought was leased to the company and laid down and fastened upon their road-bed, the material parts of which agreement were as follows :

" The said Slater agrees to lease and by these presents doth lease to the said company ten hundred and fifty-three tons of railroad iron, compound rail, to be laid down and used by said company on their railroad.

" The said company agree to pay to said Slater for the use of said iron five thousand dollars per month, the first payment to be made on the first day of March, A. D. 1855, and so on upon the first day of each succeeding month till they shall have paid to him sixty-eight thousand four hundred and fifty-five dollars and the interest on the same from the 16th day of September, A. D. 1854."

" If there shall be any default of said payments to said Slater the said company hereby authorize said Slater to take up and remove the said iron leased by him to them, though the same be put down and used upon their railroad.

" If there shall be no default of said payments the said Slater agrees, when the said sixty-eight thousand four hundred and fifty-five dollars and the said interest shall have been paid to him as aforesaid, that then he will sell and deliver to said company the said iron leased by him as aforesaid, giving them a receipt in full of all demands for the use of said iron and a release of all his interest in and to the same without further consideration."

And it was further alleged and was proved at the hearing that the railroad company failed to pay its note at maturity, March 1, 1856, and accordingly certain of the guarantors, including the complainant, were called upon to pay and did pay the amounts guaranteed by them, severally, thereon.

The prayer of the bill was for a decree to compel Slater to take possession of the iron and dispose of it and out of the proceeds reimburse to such guarantors the amounts of their several payments.

Among the parties cited as respondents, who appeared and contested the prayer of the bill, was the Southern Midland Railroad Company (incorporated by St. 1861, *c.* 155, as the Midland Land Damage Company and changed in name by St. 1863, *c.* 116), which alleged title to the iron in dispute by virtue of a conveyance by the Boston and New York Central Railroad Company on November 1, 1858, of its " railroad and all its other property," specifying " the road-bed and all land taken or purchased by said grantor," and also " all rails, timber, iron," " fixtures and other equipment," " belonging to said grantor," to the Midland Railroad Company, (incorporated by St. 1858, *c.* 60); and of a subsequent conveyance of the same by the Midland Railroad Company on June 14, 1862, to the Midland Land Damage Company : and which further contested the prayer of the bill, as being the assignee of unsettled claims for land damages, to an amount more than the value of the iron, of the owners of the land over which the railroad was located.

Another party, cited as respondents, who appeared and contested the complainant's prayer, was the trustees for the holders of bonds of the Boston and New York Central Railroad Com-

pany, under a mortgage deed (alleged in the bill to be invalid) given by that company to secure those bonds, and dated March 7, 1854, of its railroad and franchise, "including all the land and real estate used and intended to be used by said company for their said road, and all rights, easements, privileges and appurtenances," and also "all articles of personal property whatsoever now owned or used by said corporation or which they may hereafter own or use."

And the trustees for the holders of bonds of the Southern Midland Railroad Company, under a like mortgage deed given by that company, were also made a party to the bill.

The case was reserved for determination by the full court.

*G. F. Hoar & F. P. Goulding,* for the complainant.

*P. C. Bacon,* for the respondent Slater.

*S. W. Bates,* for the Southern Midland Railroad Company.

*C. B. Goodrich,* for the mortgagees and land owners.

FOSTER, J.    There can be no doubt that the rails when laid upon the road-bed and fastened there so that engines and cars could pass over them would have become annexed to the realty and ceased to be personal property, in the absence of any agreement changing the ordinary rule of law.

It was held in *Pierce* v. *Emery,* 32 N. H. 484, and *Haven* v. *Emery,* 33 N. H. 66, that rails delivered under an agreement that they should be laid down on a specific part of the railroad and continue the property of the vendors until a specified price was paid for them, remained the personal property of the vendors until payment, and were not, when laid, so inseparably annexed to and incorporated with the realty that they could not be removed for non-payment of the price.    The agreement of the parties was held to supersede the general rule of law, and to be binding likewise upon subsequent mortgagees with notice. Notice to the trustees was held to be notice to the bond holders under such a mortgage.    But without notice it was considered that the mortgagees would not be affected by a private agreement changing the natural and legal character of the property from real to personal, but would have a right to suppose that they acquired all the incidents and appurtenances which by the

general rules of law would result from such a purchase. We are satisfied with the principles and follow the authority of these cases. *Strickland* v. *Parker*, 54 Maine, 263.

Our own adjudged cases fully support the position that the rails when laid became a part of the realty in the absence of any agreement to the contrary. *Peirce* v. *Goddard*, 22 Pick. 559. *Winslow* v. *Merchants' Insurance Co.* 4 Met. 306. *Butler* v. *Page*, 7 Met. 40. *Richardson* v. *Copeland*, 6 Gray, 536. They likewise recognize the doctrine that buildings and other erections or fixtures so attached to the realty as to become ordinarily a part thereof may, by agreement between the parties, remain personal property. *Curtis* v. *Riddle*, 7 Allen, 185. Both of these propositions seem to be everywhere accepted as sound law.

Upon the question whether the character of property can be changed by agreement from realty to personalty as against a *bonâ fide* purchaser without notice, there is not entire harmony of the authorities; but we regard the better opinion as being that such a purchaser must have notice of the agreement before he acquires title, or he will be entitled to claim and hold everything which appears to be and by its ordinary nature is a part of the realty. *Elwes* v. *Mawe*, 3 East, 38; 2 Smith Lead. Cas. 99, and notes. To hold otherwise would contravene the policy of the laws requiring conveyances of interests in real estate to be recorded, seriously endanger the rights of purchasers, afford opportunities for frauds, and introduce uncertainty and confusion into land titles.

Nor do we suppose that a mortgagor in possession is competent to bind existing mortgagees by any arrangement to treat as personalty annexations to the freehold. The legal character of the rails when once laid down is determined by the law to be that of real estate. Mortgagees, as well as all other parties in interest, are entitled to the benefit of this rule of law, which can be taken from them only by their own waiver. Land owners, having a lien upon the location for their damages and a right to take possession for default of payment, stand in the same position so long as their right remains to enforce payment by entering on the land.

Whether the mortgage of the railroad executed before these rails were laid, but then invalid, and afterwards confirmed by the legislature, should be treated as a security prior or subsequent to the laying of the rails, will probably not prove a material question in this case. By the agreement of the parties it must be sent to a master to ascertain all the facts as to notice; upon the coming in of his report we can more conveniently and intelligently determine whether the agreement with Mr. Slater is still capable of being enforced.

It is valid between the parties, Slater and the original corporation, but binding upon prior mortgagees and the land owners (if they remain entitled to possession as security for their damages,) so far only as they have consented that the rails shall remain personalty. It is binding upon such subsequent incumbrancers and grantees as had notice of it when they acquired title, but upon no others.