# CASES

## DECIDED IN THE

# SUPREME COURT OF GEORGIA

### AT THE

### MARCH TERM, 1898.

CHARLESTON AND WESTERN CAROLINA RAIL-
WAY COMPANY *et al. v.* HUGHES *et al.,*

and *vice versa.*

1. All questions relating to the title relied on by the plaintiff in this case are settled by the decision of this court in the case of *Fleming v. Hughes,* 99 *Ga.* 444.

2. The interest in the land which is acquired by a railroad company, in a proceeding to condemn under the exercise of the power of eminent domain, is whatever interest the person against whom the proceeding is had has in the land, and no more.

3. An intervenor in an equity suit, praying for relief both legal and equitable, is bound to give effect to all of the equitable rights in the subject-matter of the controversy which the defendant ·in the intervention may lawfully set up against him. One who avails himself of a remedy in a court of equity is as much bound by the maxim, that he who asks equity must do equity, as one who is asserting in such court a pure equity right.

4. Where a railroad company lawfully enters upon property under a conveyance of a life-tenant, and makes thereon improvements of a character necessary for its business, it has the right, if it intends to abandon the premises at the expiration of the life-estate, to remove such improvements from the property. When it·continues in possession after the termination of the life-estate, and the property. is indispensable to the discharge by it of its public duties, the value of the improvements placed thereon at its own expense, for its own peculiar use, should not, at the instance of a remainderman setting

1

up equities and seeking their enforcement in an equitable proceed-- ing, be considered in ascertaining the damages to be paid to the lat- ter for his estate in the premises.

5. Under the rulings above made, the only question to be determined in a subsequent trial of the case will be, what compensation shall be- paid to the plaintiffs for the interest of the remaindermen in the- property.   Direction is therefore given, that this single issue be submitted to a jury; and, when the amount is thus ascertained, that. a decree be entered authorizing the defendant, within a reasonable time to be fixed in the decree, to pay to the plaintiffs the amount of ' the verdict; and that upon payment of the same the interest of the plaintiffs pass to the railway company.   Upon a failure of the rail-- way company to pay the amount of the verdict within the time fixed in the decree, their right to purchase the property should be decreed to have been lost, and a writ of possession should issue authorizing.' the sheriff to place the plaintiffs in possession under the judgment. in ejectment already rendered in the case.

Argued June 8,—Decided July 21, 1898.

Equitable petition—intervention.   Before Judge Callaway.. Richmond superior court.   October term, 1897.

S. J. Simpson, Bryan Cumming and Henry Crawford, for- plaintiff in error.   W. K. Miller and J. R. Lamar, contra.

·. COBB, J.  The last will of Charles DeLaigle was duly pro-- bated and admitted to record in the court of ordinary of Rich- mond county on May 3, 1866.   By the ninth item he made the following devise:   " To my son Louis I give, devise, and be- queath three other such parts [meaning three fourths of his. estate after the payment of his debts] to be held by him in trust for the sole and separate use of my daughters, Martha, Mary, and Emma, one part to each respectively, for and during the- terms of their natural lives, with remainders to such child or· children of my said daughters respectively as may be living at the time of their respective deaths, and in default of such child, or children, then to the right heirs of each of my said daughters. respectively."   After paying the testator's debts his executors, on April 17, 1867, assented to the devise and allotted the prop- erty in which Emma DeLaigle was interested to Louis DeLaigle as trustee for her during her natural life, with re- mainder and executory devise over as mentioned above.   At. that time Emma DeLaigle, the life-tenant, was a minor and un-- married.   Louis DeLaigle, the original trustee, died in 1867.

after the division of the testator's estate, and on October 14, 1868, while Emma DeLaigle was still a minor and unmarried, Andrew W. Walton, upon her application, was appointed as trustee for her alone by the judge of the superior court of Richmond county. · She attained her majority on March 9, 1869, being still single. Walton resigned as trustee on March 5, 1869; and on the next day E. F. Verdery was appointed trustee for her alone, upon her application, by the judge of the superior court. No bond was required of Verdery, and none was given by him. In 1870, while Emma DeLaigle was still unmarried, upon the joint petition of herself and Verdery, an order was granted authorizing Verdery to sell the fee in certain property for reinvestment, and it was sold by him under such order in that year. After the passage of this order Emma DeLaigle married, and died on January 13, 1894, leaving one child surviving her, who was born on March 17, 1872, and who intermarried with one Hughes. After the passage of the order above referred to, Verdery, the trustee, sold the property to Alfred C. Holt for the sum of four thousand dollars, and conveyed the same to him in fee simple by a deed dated September 9, 1870. · Verdery resigned as trustee after Mrs. Hughes was born. Thereafter, in proceedings regularly had, in which Mrs. Hughes was a party, represented by her mother as her next friend, Jos. B. Harris, her father, was appointed trustee in the place of Verdery and ordered to give a bond in the sum of four thousand five hundred dollars, and upon the giving of such bond Verdery was directed to turn over to him all the trust property he held as trustee for Mrs. Harris and her child. Harris as trustee gave the bond required. In 1872 the Port Royal Railroad Company, a corporation of this State, located its line of road across the land which had been acquired by Holt under the deed from Verdery, trustee. The Company not being able to agree with Holt as to the compensation to be paid to him for the acquisition of the strip required for its purposes, condemnation proceedings were instituted against Holt to have the value of the same assessed in accordance with the provisions of the Company's charter. · The only parties to these proceedings were the railroad company and Holt. The amount fixed

by the appraisers not being satisfactory to the railroad company, an appeal was entered to the superior court, and on the trial there a verdict in favor of Holt for the sum of $1,100 was the result. No judgment was entered upon this verdict. The amount specified was subsequently paid to Holt, who conveyed the property in fee simple to the railroad company by a warranty-deed dated May 8, 1873. The railroad company entered into possession and placed thereon a part of its tracks which were necessary to a complete construction and operation of the railroad which it was authorized by its charter to build. The Port Royal Railroad Company having mortgaged its entire property, including the strip acquired from Holt, to secure a large issue of negotiable bonds, and default in payment of the same having been made, in 1878 a decree of foreclosure was made by the circuit courts of the United States for the district of South Carolina and the southern district of Georgia; and under such decree a sale was had, at which certain persons representing the creditors of the corporation became the purchasers, and afterwards conveyed the same to a new corporation created by the laws of the States of South Carolina and Georgia, and called the Port Royal & Augusta Railway Company. The latter company executed two mortgages upon its entire property to secure a large issue of bonds, and in 1893 default in payment upon these bonds was made. Thereafter a proceeding in equity was instituted in the superior court of Richmond county, to foreclose the mortgages executed by the railroad company to secure the issue of bonds above referred to, and a receiver was appointed to take charge of the property and assets of the company. The strip of land which had been acquired by the Port Royal Railroad Company from Holt passed into the possession of the receiver.

On August 20, 1896, Mrs. Hughes, W. K. Miller, and J. R. Lamar presented a petition to the judge of the superior court, setting forth that they were the owners of the land in the possession of the receiver, which was described in the deed from Holt to the Port Royal Railroad Company; that upon the same there had been erected six railroad-tracks which were now in the possession of the receiver and in use by him as a part of the

railroad-yard and terminals in the city of Augusta; that Mrs.
Hughes acquired title to the property under the will of Charles
DeLaigle, and became entitled to possession on the death of her
mother, Emma DeLaigle Harris, which occurred on January
13, 1894; that she had conveyed an undivided half-interest in
the same to W. K. Miller and J. R. Lamar; that the property is
of great value, to wit five thousand dollars or other large sum,
and that the railroad-iron laid upon the same is the property of
petitioners and is of the value of seven hundred and fifty dol-
lars, and the yearly rental value of the property is six hundred
dollars or other large sum; that the company is insolvent, in the
hands of a receiver, and its assets in the State of South Caro-
lina are also in the hands of a receiver, and its property is about
to be sold under a final decree in that State, which sale is
advertised to take place on the first Tuesday in September,
1896; that petitioners can not obtain payment for the use of
their land nor eject the receiver therefrom without the permis-
sion of the court.    They pray that they be allowed to sue the
receiver, and for mesne profits from January 13, 1894, and
that, unless arrangements can be made for the purchase of the
same, the receiver be ejected and possession be surrendered by
the court to them; that pending the final determination of the
issue, the receiver be enjoined from surrendering possession of
the property in Georgia and the assets and income in his hands,
until the final order of this court; and that the receiver hold up
sufficient money to pay the judgment that may be rendered.
On this petition the presiding judge passed the following order:
"Read and sanctioned. Let this petition be filed.    Petition-
ers are allowed to intervene in said cause, and to sue J. H.
Averill, receiver of the Port Royal & Augusta Railway Com-
pany; and he and the said company are required to show cause
before me on the 31st day of August, 1896, in the superior
court room at Augusta, Georgia, why the prayer of the petition-
ers should not be granted.    In the meantime he and the said
company are restrained from changing the existing status of the
said property or permitting the same to be sold in the State of
South Carolina, as advertised, until the further order of this
court.    August 20th, 1896."    On August 31, 1896, the re-

ceiver filed an answer to the petition of the intervenors, in which some of the allegations were denied; and others were neither admitted nor denied, for the alleged reason that the receiver was not informed as to the matter. It was alleged that when he was appointed receiver he found the Port Royal & Augusta Railway Company in possession of the property, and the same passed into his possession, and he is informed and believes that the railway company had been for many years in open and peaceable possession of the same, claiming it as its own, in good faith, adversely to the claims of all others. The prayer of the answer was that the intervenors be required to make strict proof of their allegations; and that if it be shown to the court that they are the owners and entitled to possession, he be allowed a reasonable opportunity to ascertain what will be a fair and reasonable price at which to acquire the lot and negotiate for the purchase thereof, subject to the final approval of the court; and that in the event the intervenors and the receiver fail to come to an agreement as to the price to be paid, the question be submitted to a jury, and if the amount found in favor of the intervenors meet with the approval of the court, he have the option of acquiring the same at the price so found; that if in the meanwhile the property of the railway company shall have been sold in pursuance of the orders of the court, the purchasers have the option of acquiring the lot at such price. Thereafter on the same day the receiver filed an amendment to his answer, in which it was alleged that Charles DeLaigle devised a certain parcel of land to trustees for the use and benefit of his daughter Emma DeLaigle; that Verdery was appointed successor to the trustee named in the will, and by an order of court made a deed to Holt, undertaking to convey the fee-simple title; and that he is informed and believes that both Verdery, trustee, and Holt believed that the fee in the land was acquired by Holt, under the conveyance; that thereafter Holt executed a deed undertaking to convey to the Port Royal Railroad Company a fee-simple estate in the land described in the petition of the intervenors, which is a portion of the tract which Holt acquired under the deed from Verdery, trustee; that Holt and the company believed that the fee-simple title had been ac-

-quired; that thereafter the property of the Port Royal Railroad Company was sold and a deed to the same was made, including the land in dispute, to the Port Royal & Augusta Railway Company; that by virtue of the several conveyances, and in the belief that it had acquired a fee-simple estate in the strip of land, the Port Royal & Augusta Railway Company entered upon and took possession of the same, and as its receiver respondent took control of it as the property of such company. It is further alleged that the first information that the receiver ever had that intervenors claimed title to the land in controversy was when their petition was served upon him.

On April 28, 1897, the receiver filed another amendment to his answer, in which it was set up that the Port Royal Railroad Company acquired a right of way over and through the premises sued for, by virtue of condemnation proceedings had in accordance with the powers conferred upon such company in its charter, as will fully appear by the record of the court in which the present case was pending, and that the receiver is the successor to the right so acquired by the Port Royal Railroad Company. On the same day the following order was passed: " The Charleston & Western Carolina Railway Company having purchased the property of the Port Royal & Augusta Railway Company, and being in possession of the said property and that sued for by B. H. Hughes et al.: Ordered that the said Charleston & Western Carolina Railway Company be allowed to defend the claim filed by B. H. Hughes et al., and to file the pleas this day presented." The pleas of the C. & W. C. Railway Company which were referred to in the order were, in substance, as follows: It denies that the petitioners, or either of them, have any right, title, or interest, at law or in equity, in or to the premises in dispute. It admits that the main line and tracks of the Port Royal Railroad Company were located and constructed over the strip of land sued for, about the year 1873, and that ever since that time the land and the tracks thereon have constituted an indispensable portion of the main right of way and railroad of that company and now of the defendant, and that the same has been operated continuously as a part of the public highway from Port Royal to the city of Augusta for

more than twenty years.   It admits that Mrs. Hughes was the
only surviving child of Emma DeLaigle Harris, and that the·
latter died on the date alleged; the land sued for was once
owned by Charles DeLaigle, and passed under his will to Louis·
DeLaigle as trustee for Emma DeLaigle and her children; that·
Walton was appointed trustee to succeed Louis DeLaigle, and
that Verdery was appointed to succeed Walton; that on Sep-
tember 9, 1870, upon the joint petition of Verdery, trustee, and
Emma DeLaigle, the sale of the property was authorized,
Emma DeLaigle at that time being the only beneficiary of the·
trust in esse; that in accordance with the order the land was·
sold to Holt, the trustee conveying to him in fee simple; that·
the purchase-money (four thousand dollars) was paid in cash to·
the trustee, who invested it for the benefit of the trust estate;
that subsequently Verdery resigned the trust after Mrs.
Hughes, the petitioner, was born, and that on the petition pre-
sented by Mrs. Hughes on her own behalf and as next friend of·
her daughter, Jos. B. Harris was appointed trustee; that Ver-
dery fully accounted for the amount received by him and paid
the same over to Harris, trustee, after the execution by Harris·
of a bond required by the order of court; that Mrs. Hughes has
never repudiated or disaffirmed the petition that was filed in
her behalf, or restored the money paid for her use; that the
Port Royal Railroad Company had acquired the premises in
dispute as a right of way under condemnation proceedings·
which were authorized by its charter; that under such proceed-·
ings it acquired title and went into possession, and at great cost
proceeded to construct the main track of its railroad, placing
thereon divers side-tracks which were necessary for its use, and
completed the construction of its entire railroad from Augusta·
to Port Royal, South Carolina; that the property passed from
the Port Royal Railroad Company to the Port Royal & Augusta·
Railway Company by virtue of the decree rendered in the fore-·
closure proceedings brought by the bondholders of the former
company; that in 1893, in the foreclosure proceedings had
against the Port Royal & Augusta Railway Company, under·
authority of the orders of court passed therein, receiver's cer-·
tificates to the amount of one hundred thousand dollars were·

issued, and declared to be a first lien upon the entire line of railroad in the possession of the receiver; that none of such certificates were ever paid, and that the entire property of the railroad was sold because of the non-payment of the same, together with a large amount of the other indebtedness of the receiver, amounting to not less than one hundred and fifty thousand dollars; that the defendant became the purchaser of the Port Royal & Augusta Railway Company at such sale, and received a conveyance of the same from the master; that under the law of Georgia the trustee of such a trust as was created by the will of Charles DeLaigle was not only for the benefit of the lifetenant but was to preserve the contingent remainders, and that Mrs. Hughes and her grantees are concluded; and especially under the sale of the trustee to Holt, that Mrs. Hughes elected to ratify and affirm the sale when she applied for the appointment of Jos. B. Harris as trustee, under which order the purchase-money received by Verdery, trustee, was recognized as representing the entire estate in the property and turned over to Harris, trustee, as such; that Mrs. Hughes well knew all of the facts and when she became of age did not disaffirm such transaction or undertake to avoid the condemnation proceedings until August, 1896, and stood by and allowed the railroad company to occupy that portion of its right of way, many times a day using the same for the handling thereon of trains carrying passengers, freight and mails; that petitioners are not entitled to maintain an action of ejectment or destroy the unity of the property as maintained and enjoyed for more than twenty years, and thus deprive the public of the benefit of a completed and operated railroad.

The court sustained a demurrer to the plea of the C. & W. C. Railway Company, and this ruling is the basis of one of the assignments of error in the main bill of exceptions. Thereafter the C. & W. C. Railway Company offered the following amendment to its pleading: "Now comes the Charleston & Western Carolina Railway Company, admitted to defend against the intervention of B. H. Hughes and others, and presents for refiling under the sanction of the court its original answer, and protesting against any judgment or decree against

it, and reserving the right to except thereto, and reserving also all exceptions heretofore made and the right to insist thereon, for an amendment to the original prayer of the answer prays that the court order that if any verdict or decree is rendered against this defendant, the Charleston & Western Carolina Railway Company, that it be not one of ejectment, but a money verdict for the value of the land, upon the payment of which this defendant may retain the premises in dispute." The presiding judge refused to allow the original answer to be refiled with the amendment, and this is assigned as error. While the original answer of the defendant was stricken on demurrer, it appears from the record that at the trial of the case all of the evidence which would have been admissible under such an answer was admitted, and the facts appearing in such evidence are set forth in the first part of this statement. After all the evidence was submitted, the judge directed the jury to find for the plaintiffs the premises in dispute, but that the railroad-iron thereon was the property of the defendant. Upon this verdict a judgment was entered for the plaintiffs against the defendant for the land in dispute, directing a writ of possession to issue, and authorizing the sheriff, on demand of the plaintiffs, to put defendant, its agents and servants, out of possession. Thereupon the defendant excepted, and the plaintiffs by cross-bill complained of rulings which will be hereinafter referred to. The errors assigned in the main bill of exceptions were: First, the court erred in sustaining the demurrer to the original answer of the defendant; second, the court erred in refusing to allow the defendant to refile its answer with the amendment so as to have a money verdict against the receiver, because, if under the evidence petitioners show a title in them which would ordinarily authorize a recovery in ejectment, there should in the present case be a finding for a sum of money, or a decree authorizing the receiver to acquire the premises by the exercise of the power of eminent domain enjoyed by the Port Royal & Augusta Railway Company. The assignment of error in the cross-bill of exceptions was, that the court erred in directing the jury to find for the defendants the iron rails and other improvements located upon and permanently attached to the rail-

road, it being insisted that such rails and other improvements, being permanently attached to the railroad, should pass with the real estate.

1. The item of the will of Charles DeLaigle under which the petitioners derived title was construed by this court in the case of *Fleming* v. *Hughes,* 99 *Ga.* 444. It was there held, that the legal title passed to the trustee as to the life-estate only; that the remainder created was a legal and not an equitable estate, and that therefore the order of sale which was granted on the application of Verdery, trustee, did not authorize the sale of any other interest in the land than the life-estate of Emma De-Laigle. The only interest acquired by Holt under such sale being the life-estate, that was all that he could convey. By the terms of this decision the title to the fee vested in Mrs. Hughes upon the death of her mother on January 13, 1894. It appears, therefore, that all the issues raised in the present case involving the question of title are conclusively settled by the case cited.

2. The Port Royal Railroad Company was incorporated by an act of the General Assembly, approved December 19, 1859; and by its charter it was declared that " the said company shall possess and enjoy the same privileges as to right of way as are vested in, and enjoyed by, the Central Railroad & Banking Company of Georgia." Acts 1859, p. 324. In the charter of the Central Railroad & Banking Company it was provided that that company should have power to construct a railroad, " paying to the owners of lands through which the same may pass a just indemnity " for the value of the land covered by the railway and the right of way on either side thereof. If the company could not acquire the title to the right of way by purchase, it was provided that the amount of damage or injury occasioned by the construction and maintenance of the road should be ascertained and determined by the award of three appraisers, one to be chosen by the company, one by the " owner," and one by the inferior court of the county where the land lay; and if the " owner " should decline to appoint an appraiser, then two were to be appointed by the inferior court, the finding of the appraisers to operate as a judgment for the amount against the com-

pany, either party having the right to appeal from the award of the appraisers to a special jury in the superior court. It was provided that " the decision shall vest in the company the fee simple of the land in question, and in the other party a judgment for its value." In making the valuation the appraisers, and in case of appeal the jury, should take into consideration the loss or damage which may occur to " the owner " or "owners" in consequence of the land being taken, and also the benefit and advantage to be received from the construction of the railroad. Prince's Dig. pp. 331-332 (Acts 1835, p. 217). It will be seen that, under the charter above quoted from, it was contemplated that the right of way should be acquired by purchase from the "owner" of the land, and that upon failure of the company and the owner to agree upon the amount to be paid, condemnation proceedings could be had in the manner above referred to, and that the persons against whom such condemnation proceedings must be instituted were the owners of the property, that is, the same persons with whom the company would be required to negotiate for the purchase of the property. The persons, therefore, who are the owners and who would have to be consulted if a purchase at private sale was desired, are the ones who should be made parties to the condemnation proceedings. If the person in possession of the property was not clothed with the power to make a conveyance of the interest of another in the same property, then such person could not acquire the right to dispose of the interest of the other party by submitting to condemnation proceedings to which the other person at interest was not a party, nor deprive the other of his right to assert his interest, whatever it may be, against the corporation instituting the condemnation proceedings. If a life-tenant could not convey to a railroad company for a right of way the interest of a remainderman, the most solemn judgment that could be rendered in condemnation proceedings, to which the railroad company and the life-tenant alone were parties, could not operate as an estoppel upon the remainderman. It becomes necessary in the present case to determine whether, in condemnation proceedings instituted under the provisions of the charter referred to against a person who was the assignee of the

life-tenant, the interest of a contingent remainderman, who was not in esse when the proceedings were had, passed to the railroad company. The award of appraisers in such proceedings operates as a judgment between the parties, and is governed by the same rules that would ordinarily be applied to judgments of courts; and such an award, or a verdict and judgment on appeal from the same, has the same force as an ordinary judgment rendered by a court of competent jurisdiction. It is conclusive upon the parties and privies, but is not binding upon strangers. If at the time the condemnation proceedings were had there were two estates in the property, one a life-estate, and the other a contingent remainder, the fact that it was impossible to ascertain the persons who would eventually take as remaindermen upon the happening of the contingency provided for in the will would not authorize the conclusion that the interest of such remaindermen was acquired by proceedings against the life-tenant, who under no circumstances could be held to represent them. If the condition of the title to the property at the time of the condemnation proceedings is such that notice can not be given to all interested, notice to such as are definitely known to be interested would not be held to be sufficient to deprive of their rights others whose identity was unknown, but whose interest in the property was ascertainable.

Condemnation proceedings pass title to whatever interest the parties who took part in the proceedings have in the property, and a party who could not be notified is not bound by the award or judgment. In such cases the railroad company would fail to acquire a perfect title to the property; and this imposes no greater hardship upon a railroad company than it does upon any other person who desires to purchase property in which there is a contingent interest outstanding in some one whose identity can not be determined at the time of the purchase. The condemnation proceedings are no more than a compulsory sale of all the owner's interest in the property, and no one can be thus compelled to sell who is not a party to the judgment rendered by the tribunal which is erected for this purpose. Therefore a railroad company which sees proper to construct its railway over land where the title is in the condition above

referred to, acquires the interest of all those with whom it deals by negotiation, or against whom it proceeds by condemnation, but takes the risk of other persons interested making claims in the future, whether they be left out of the negotiations or the condemnation proceedings by mistake or from necessity. In the present case condemnation proceedings against the assignee of the life-tenant, to whom the entire amount awarded as damages was paid, is pleaded in bar of the right of the remainder-man in the same property to have compensation for her interest after the termination of the life-estate. This can not be the law. For if so, the right of the legislature to confiscate in the interest of public improvements under the guise of condemnation proceedings would be complete, it being only necessary that one person who was interested in the property should have notice, and by such notice the interest of every other person would be held to pass, although ignorant of the proceedings under which their property was taken. Under the ruling made in the case of *Fleming* v. *Hughes,* supra, Emma DeLaigle had only a life-estate in the property, and this was the only estate acquired by Holt under the purchase from Verdery, trustee. Holt, therefore, represented no one but himself, and in the condemnation proceedings instituted against him his interest in the land was all that could be affected by the judgment. As he did not acquire the interest of Mrs. Hughes, and as it is not pretended that any part of the money paid to him by the railroad company was ever paid over to Mrs. Hughes, or to any one authorized to represent her, or was ever used for her benefit in any way, the condemnation proceedings, if they had terminated in a regular judgment, instead of a conveyance voluntarily executed by Holt in accordance with the verdict of the jury, could not be used against Mrs. Hughes to raise either an estoppel by record or any other estoppel which would have the effect of preventing her from asserting her rights in the property. Under this view of the case, it is unnecessary to determine whether the condemnation proceedings were invalid on account of one of the arbitrators not having been regularly appointed, or whether the railroad company waived its rights under the condemnation proceedings by taking the deed from

Holt. Holt was lawfully in possession of the life-estate under the conveyance made to him by Verdery, trustee, and he had a right to sell that interest, and the same passed to the railroad company under the deed which he executed to it after the verdict had been rendered in the condemnation proceedings. In the case of Railroad Company v. Stroud, 45 Ark. 278, it was held that it was incumbent on the railroad company which was seeking a condemnation of a right of way, to ascertain the owners of the land and make them parties to the proceedings, and by selecting the parties against whom it proceeded it admitted their ownership. In the opinion Cockrell, C. J., referring to the rule above stated, says: " The company alone can start the proceedings, and when it does so it must proceed against the owner, and it selects the parties to be proceeded against at its peril, because, by starting the proceedings against them, it admits that they are the owners. This is no hardship on the company. The records and other means of information are open to it, and if the title to the land to be taken is uncertain or in dispute, it may bring all persons who appear to be owners or part owners into court, and, when the damages are assessed and paid into court, leave the contending claimants to settle among themselves their controversy as to the fund awarded."

3. When a railroad company, without warrant or authority, enters upon the land of another, it is, as a general rule, no less a trespasser than any other person who is guilty of an act of a similar nature. If, however, a railroad company enters upon the land with the consent of the owner, or under license from him, and the property thus taken possession of becomes such a necessary component part of its railroad that to surrender its possession would interfere seriously with the interests of the company, the landowner, although entitled to compensation for his property, might by his conduct in allowing the entry upon his land and permitting the company to so use it as that it could not be abandoned without great prejudice to its rights, estop himself from asserting against the company the legal title to the property by an action of ejectment. The propositions above stated are simply the application of familiar principles of law

which govern in all transactions of the character above referred
to, whether the controversy be between natural persons alone,
or between such persons and corporations, and whether the cor-
poration be public or private.   A railroad corporation, being
one charged by the law with the performance of certain duties
to the public, is allowed, under some circumstances, to set up
rights connected with the land over which it operates its line
of railway, of which an individual or an ordinary private cor-
poration would not generally be allowed to avail itself.    Contro-
versies in reference to the possession of land, where the rights
of individuals only are involved, are purely matters of private
concern.    Controversies in which a corporation charged with
the duties incumbent upon carriers of passengers, freight, and
mails, in which an effort is made by private individuals or oth-
ers to take away from such corporation a part of the property
in its possession, which is absolutely essential to its complete
performance of the public duties required of it, become matters
of more than private concern, and in which the public is deeply
and seriously interested.    For this reason it has become settled
law that the harsh remedies which would be allowed to one in-
dividual against another in reference to the possession of land
will not be allowed to one who is seeking to recover such prop-
erty from a railroad company, when exact justice can be done
to such owner by giving him remedies which are less severe in
their nature, and by which he would secure substantially the
same rights, thereby saving to the public the right to require a
performance of the public duties incumbent upon the corpo-
ration whose property is the subject-matter of the controversy.
That a railroad corporation has a right to deprive a person of
his property for its uses by doing acts which in an individual
would be dealt with as a trespass is not contended for; but when
a railroad company enters upon land and constructs its road
without lawful authority, and the landowner acquiesces in the
wrongful act and the consequent appropriation of the property
to a great public use until the same has become a necessary com-
ponent part of the property required by the railroad to perform
its public duties, such landowner will be held to have waived
his right to retake the property, and will be remitted to such

other remedies for the wrong done him as will not interfere with the rights of the public to have the railroad maintained and operated. If this is the case in reference to unlawful entry, for a stronger reason the same result would follow if the entry by the railroad company in the first instance was by the authority or consent of the landowner, even though it be under a parol license and the legal title to the land still remain in the landowner. The current of modern authority sustains the proposition, that when a railroad company is in possession of land, using it as a right of way, although not having acquired the legal title thereto, the landowner would be estopped from ejecting the company from the premises, if it was shown either that the original entry was with his consent, or that the entry without his consent was so long acquiesced in that to allow the company to be ejected would either dismember the property of the company, or essentially interfere with its ability to discharge the public duties incumbent upon it. This, however, is subject to the qualification that the landowner is entitled to compensation for his property, and this must be ascertained and paid to him before the corporation is vested with a complete right to hold and enjoy his property as its own.

In the case of Railway Company v. Allen, 113 Ind. 581, the general rule is stated to be, that when land is seized by a railroad company without right, the owner may maintain ejectment; but where there has been an acquiescence on the part of the owner until public rights have intervened, such action will not lie, but the landowner will be confined to a recovery of compensation. In Railway Company v. Beck, 119 Ind. 124, it was held that "A landowner who stands by, without demanding compensation, until a railroad company has so far completed and put in operation its road over his land as to involve the public interest, can neither enjoin the company nor maintain ejectment to recover his land. The only remedy left to the landowner, in such a case, is to proceed within the proper time to have his damages assessed and enforced against the railroad company." In the case of Railroad Company v. Pfeuffer, 56 Tex. 66, it was held, that where land was appropriated by a railroad company without authority, the right of the owner to

compensation was not waived by his standing by and permitting · the company to construct its road over his land, nor was his right to recover the land lost if the company refused to make compensation. In the case of McAulay *v.* Railroad Company,. · 33 Vt. 311, it was held, where a landowner acquiesced in the occupation of his land for the construction of a railroad, without requiring prepayment of damages upon a contract for future · payment by the company, and the road was constructed and put in operation, that he could not afterwards, on failure to obtain payment, maintain ejectment or trespass for the land. See · also Roberts *v.* Railroad, 158 U. S. 1; 3 Elliott on Railroads, § 1049. In those cases where it has been held that the landowner would be entitled to bring suit against the company in ejectment, and where a judgment in ejectment was allowed to · be rendered, it was also held that upon appropriate pleadings the issuing of a writ of possession would be stayed until the company could be allowed a reasonable time in which to acquire title to the property, either by purchase or condemnation, or that the enforcement of such a judgment in ejectment would be · enjoined for a similar reason. Railroad Company *v.* Bruce, 102 Pa. St. 23; Railroad Company *v.* Jones, 59 Pa. St. 433; Conger *v.* Railroad, 41 Iowa, 419; Railroad Company *v.* Adams (Fla.), 14 L. R. A. 533. In the case of *Young* v. *McKenzie,* 3 *Ga.* 31, it was held that an action of ejectment · against a bridge company to recover property in its possession,. and necessary for the purpose of building the bridge, but to which the title had not been acquired either by purchase or condemnation, should be enjoined until the bridge company should have a reasonable time to comply with the terms of its charter · in reference to condemning the property for its use. In this case there had been an attempt to acquire the land by condemnation, which failed for the reason that the proceedings before the appraisers were recorded in the wrong place. Under color of this authority the land was entered upon and the bridge built, and this was one of the reasons which brought the court to the · conclusion that in equity the company should not be ejected until an opportunity had been afforded it to acquire the land by condemnation.

It is contended, however, in the present case, as the title acquired by the railroad company under the deed from Holt was for the life-estate of Emma DeLaigle only, that upon her death the title immediately vested in Mrs. Hughes, and that the possession of the railroad company, relatively to Mrs. Hughes, became wrongful and unauthorized, and that therefore she is entitled to treat it as a naked trespasser upon her property, she having done nothing which would amount to a consent on her part to the appropriation of the property by the company, and the lapse of time between the death of her mother and the filing of the suit not being sufficient to have amounted to such an acquiescence as would deprive her of the right to maintain an action of ejectment against the company. Nothing appears in the record which would amount to an estoppel against her. There was no evidence that she received any part of the money which was paid to Verdery, trustee, when the property was sold to Holt, nor that any part of the same was ever used for her benefit; nor has there been any ratification of the acts of those persons who attempted to convey to the railroad company her interest in the property; nor has the time which has elapsed since her right of entry accrued been of such duration as to show an acquiescence in the wrongful appropriation of her property. The case should be. treated as one in which the owner of the land who is asserting title against the railroad company never consented to its occupation by the company, either by herself or by any one authorized to represent her. But while this is true, we think that, under the circumstances of this case, Mrs. Hughes should not be allowed to treat the company as a naked trespasser. Its entry upon the property in the lifetime of Emma DeLaigle was lawful and authorized. At the time of its entry, and so far as the record shows, up to the time of the claim now set up by Mrs. Hughes, it and its successors believed that they had acquired a fee-simple title to the property, the deeds under which they claimed purporting to convey such an estate. Their right to possession after the death of Emma DeLaigle was at least colorable. It has been said that "an original entry by the consent of a tenant for life is lawful, and will not subject the party enjoining to an action for dam-

ages on the part of the remainderman, although damages have not been paid." Mills, Em. Dom. § 142. The statement above made was quoted approvingly and followed in the case of Railroad Company *v.* Goodwin, 111 Ill. 273. In the case of Austin *v.* Railroad Company, 45 Vt. 215, it was held that where a railroad company had entered into possession of property with the consent of the life-tenant and continued to use and possess the same after the termination of the life-estate, to the exclusion of the remainderman, and without appraisal or payment of damages, the remainderman could not maintain ejectment against the company. Even if we were disposed to do so, it is not necessary for us to go to the length of the decisions just cited. We are of opinion that the petitioners in the present case have waived their right, if any they had, to insist in the first instance upon a judgment in ejectment against the railroad company, not by anything they have done before they instituted their suit, but by the way in which they have brought their suit and the character of the same and of the relief prayed in the original petition. The assets of the Port Royal & Augusta Railway Company were in the custody of a court of equity through the medium of a receiver, and he had possession of the property now in controversy. The petitioners did not apply to this court for leave to go into a common-law court and assert there a strict and technical common-law right; but they applied to this court of equity to be allowed to come in and make themselves parties to the pending suit, and set up their right in such suit against the receiver and the company which was represented by him; and they prayed for a judgment declaring them to be the owners of the property described in their petition, and that they be placed in possession of the same, if the court should decide in their favor; and distinct prayers were made for an order in the nature of an injunction against the receiver to prevent him from delivering any of the property in Georgia to those who might become purchasers under the order of court in the State of South Carolina until the issues raised by them should be determined; and further, that the receiver should be required to retain in his hands a sufficient sum of money to pay the judgment that might be rendered in favor of petitioners.

On this petition the court passed an order allowing the petitioners to intervene in the cause, and granted an order restraining the receiver from changing the existing status of the property, or permitting the same to be sold in the State of South Carolina, as petitioners alleged was about to be done. The petitioners have not only resorted to a court of equity to set up their claim, but they have come in praying in their behalf distinct equitable relief. They practically concede that a contingency may arise in which the parties in possession of the land claimed by them would be authorized to purchase the same, such being the inevitable inference to be drawn from the prayer asking that a sum of money be impounded in the hands of the receiver for their benefit.

"He who would have equity must do-equity, and give effect to all equitable rights in the other party respecting the subject-matter of the suit." Civil Code, §3924. The meaning of this maxim is, "that whatever be the nature of the controversy between two definite parties, and whatever be the nature of the remedy demanded, the court will not confer its equitable relief upon the party seeking its interposition and aid, unless he has acknowledged and conceded, or will admit and provide for, all the equitable rights, claims, and demands justly belonging to the adversary party, and growing out of or necessarily involved in the subject-matter of the controversy. It says, in effect, that the court will give the plaintiff the relief to which he is entitled, only upon condition that he has given, or consents to give, the defendant such corresponding rights as *he* also may be entitled to in respect of the subject-matter of the suit." 1 Pom. Eq. §385. Any one going into a court of equity and asking its aid, whether that aid be such as could be obtained in a court of law, or whether it be of a character obtainable only in a court of equity, submits himself to the jurisdiction of the court, and in asking its aid subjects himself to the imposition of such terms as well-established equitable principles would require. Especially would this be true where the relief sought by the party applying to the court is both legal and equitable in its nature. No one can read the facts of the present case without being impressed that there is an overwhelming equity in favor of this railroad

company being allowed to purchase from the petitioners the property owned by them, and which is so necessary to the complete operation and maintenance of the company's road in the discharge of its public duties.    Whatever might have been Mrs. Hughes's rights against the company if she had sued at law, or if she had obtained leave of this court of equity to have maintained at law an independent suit against the receiver or other persons in possession, under the remedy which she has elected she is bound to submit the subject-matter of the litigation to the adjudication of the court upon equitable principles.    Her right to insist upon a judgment of ouster in the first instance is therefore gone, if the defendant desires to insist upon its right to purchase the property; and the pleas of the defendant, which set up its right to have the value of the property passed upon by a jury, that they might be given an opportunity to purchase and pay for the same, were good in substance, and should not have been stricken. . It is contended, however, that as the defendant is a foreign corporation, and as it has no authority under the laws of this State to acquire property by condemnation, it had no right to come into court and file a plea asking that what was equivalent to a condemnation be had in the pending suit.    While it is not a corporation organized under the laws of this State, by comity it is permitted to come into this State, and is here discharging public duties of the nature usually performed by corporations of that character, and it is as fully under the control of the laws of this State in regard to the discharge of such public duties as if it had been incorporated under our laws.    As a foreign corporation it has the right, until stopped by the State, to maintain and operate its railroad within the limits of this State.    In order to exercise this right, the property in controversy is an essential part of its right of way and terminals.    Such being the case, the equity in its favor, requiring that the court of equity to which petitioners have applied should accord to it the right to acquire by purchase the possession of the property before a harsh judgment of ouster should be rendered against it, is just as strong as if it had authority to acquire possession of the property under the exercise of the power of eminent domain.    The equity in favor of

a railroad company, in such a case, does not grow out of the right it might have under the law to acquire title to the property in which it happens to be in possession, but it grows out of the fact that it is in possession of the property; that the entry of its predecessor in title was lawful and authorized; and that the same has become a necessary component part of the property of the corporation, which is discharging duties of a public nature. The court should have allowed the pleas filed; and, after the damages had been assessed by a jury, a decree should have been entered, allowing the defendant a reasonable time, to be stated in the decree, to pay the damages so assessed, and, upon its failure to pay the same within the time specified, that the petitioners recover the land and writ of possession issue.

4. The judge of the superior court directed the jury to return a verdict in favor of petitioners for the land in dispute; and directed them also to find that the railroad-iron thereon was the property of the defendant. This latter ruling is the one complained of in the cross-bill of exceptions. It appears from the record that the railroad-iron referred to in the verdict was the tracks which had been placed upon the land in controversy by the railroad company as a part of its main track between its terminal points, and also side-tracks used as a part of its terminals in the city of Augusta. It is apparent that these improvements were made upon the property with no intention on the part of the railroad company to improve the value of the estate, but solely for its uses and purposes in its business as a common carrier of freight and passengers. Upon the termination of the life-estate which the railroad company acquired under the conveyance from Holt, did the title to these improvements vest in the remainderman at the same time that the title to the land vested? In the case of Elwes v. Maw, 3 East, 34, Lord Ellenborough reached the conclusion, after an elaborate examination of authority, that buildings and the like, erected by a tenant upon the leased premises for the purposes of agriculture and necessary for the occupation of the farm, and the immediate profits of the land, were not removable by the tenant even during his term; but that such improvements as were placed by the tenant upon the premises for purposes of

trade were not governed by the same rules, and were removable by the tenant at any time before the expiration of his term. This decision was followed by the Supreme Court of the United States in the case of Van Ness *v.* Pacard, 2 Pet. 137. The same doctrine is recognized in the case of *Carr* v. *Georgia Railroad,* 74 *Ga.* 73, though what is said in that case is merely obiter. In Meigs's Appeal, 62 Pa. St. 28, it appeared that during the civil war the United States authorities erected certain buildings used as military barracks and hospitals in the borough of York. After the war had ended and the buildings were no longer used by the government, they were offered for sale, the purchaser to have the privilege of removing the same from the premises. The authorities of the borough applied for an injunction to prevent the removal of the buildings, alleging that they were of a permanent nature, attached to the realty, and therefore became the property of the borough, and could not be removed after the government had abandoned the use of them for the purposes for which they were erected. It was held, that the buildings thus erected being placed there at the time when the necessities of the government required the same for military purposes, when the conditions requiring their use ceased to exist the government had a right to remove the same from the premises. In the case of Wagner *v.* Railroad Company, 22 Ohio St. 563, it was held, that stone piers built by a railroad company as a part of its railroad, on lands over which it had acquired a right of way for its road, did not, though firmly imbedded in the earth, become the property of the owner of the lands as part of the realty; and that when the railroad company abandoned the purpose of completing the railroad, it had a right to remove such structures from the premises as personal property; and the fact that the landowner had been allowed to take possession of the land embraced in the right of way and hold it for a term of years less than is required to extinguish the easement, did not, in itself, imply a relinquishment on the part of the railroad company of its right to enter and remove the piers. In the case of Railway Company *v.* Dunlap, (Mich.) 5 Am. & Eng. R. R. Cases, 378, it was held, that a railway-track, or other improvement wrongfully placed upon

land by a railway company, and not abandoned to the owner of the premises, can not be treated as a part of the realty for the purpose of increasing its value in estimating the damages due to the owner in subsequent proceedings to condemn the land for the use of the company. In Justice v. Railroad Company, 87 Pa. St. 28, it was held, that where a railroad company was a trespasser and its entry upon land not in conformity to law, structures placed upon the property for use by the company in its business did not pass to the landowners, and their value was not to be included in an assessment of damages in proceedings afterwards instituted to acquire the property. In Railroad Company v. Goodwin, supra, it was held, that a railroad company which had entered upon land and constructed its road over the same under a license from the life-tenant would not be required to pay to the person entitled to the property, after the termination of the life-estate, the value of the structures which had been placed upon the property at its own expense. See also Elliott on Railroads, §§ 997-998.

In the present case, at the termination of the life-estate, if the railroad company had abandoned the possession of the property without removing the improvements which it had placed thereon, such improvements would probably have passed to the remainderman; but under the facts of this case, where it remained in possession, using the same in discharging public duties which were incumbent upon it, although its possession would be, in some sense, wrongful as against the remainderman, it is not to be treated, as has been shown, as a naked trespasser. It would have had the undoubted right, under the authorities above referred to, to remove from the premises the structures which it had placed thereon at any time during the existence of the life-estate. As it had a right to remain upon the premises and have their value ascertained in order to acquire a complete title to the same, the mere fact that at the time of the assessment these improvements were still upon the property does not require that they shall be dealt with as the property of the landowner. Therefore, the petitioners having gone into a court of equity, in assessing the damages which should be paid to them the value of the improvements should not be considered. The

amount which the plaintiffs would be entitled to recover would be the market value of the property at the time the life-estate terminated, with interest from that time to the date of the verdict, the value of the improvements placed on the property not being considered in ascertaining such market value.

5. Under the rulings we have made, the only question to be determined upon another trial of this case would be, what compensation should be paid to the petitioners for the interest of the remainderman in the property? As all other questions are finally settled by this decision, direction is given that this single issue be submitted to a jury, and that they determine it in accordance with instructions given by the trial judge, following the rulings we have made. When the amount to be paid to the petitioners is thus ascertained, a decree should be entered, allowing the railway company a reasonable time in which to pay the amount thus found, and upon payment of the same, the title to the property to vest in the railway company. Upon a failure to pay the same within the time limited, the right of the company to acquire the property should be decreed to be lost, and a writ of possession should issue to enforce the judgment in ejectment already rendered in the case.

*Judgment on main bill of exceptions reversed with direction; on cross-bill affirmed. All the Justices concurring.*