OCMULGEE RIVER LUMBER CO. v. OCMULGEE VALLEY RY. CO.

(District Court, S. D. Georgia, W. D.   July 17, 1917.)

1. CORPORATIONS ☞383—MODE OF ACTING.
   A corporation can act only in a corporate capacity.

2. ESTOPPEL ☞90(1)—"ACQUIESCENCE."
   "Acquiescence" imports active consent, and is not to be inferred from acts which are doubtful or ambiguous, and consequently, where a corporation consistently protested against the appropriation of its property, acquiescence cannot be inferred.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Acquiescence.]

3. RAILROADS ☞178—ENFORCEMENT OF CLAIM AGAINST SPECIFIC PROPERTY.
   Where rails and other railroad property belonging to a lumber company were appropriated by a railroad company without the consent of the lumber company, and some of the property was incorporated in the railroad, a suit by the lumber company to recover its property cannot be defeated on the ground that such property was devoted to a public use, and the lumber company is entitled to a decree for its value, and, in event of nonpayment, to remove the property.

In Equity. Bill by the Ocmulgee River Lumber Company against the Ocmulgee Valley Railway Company. Decree for complainant.

Hardeman, Jones, Park & Johnston, of Macon, Ga., for plaintiff.

W. S. Mann, of McRae, Ga., and Hall & Grice, of Macon, Ga., for defendant.

SPEER, District Judge. The pleadings and the evidence in this case disclose the fact that the Ocmulgee Valley Railway Company has constructed a short railway, which purports to extend from Lumber City to a point in the pine woods some miles short of Jacksonville, Telfair county, Ga. Jacksonville was once the courthouse town of the county, but for this purpose has long been abandoned. It might be termed a river town, but for the fact that it is something more than a mile from a landing on the Ocmulgee.

The Ocmulgee Valley Railroad is not a prosperous artery of commerce. During last year it spent nothing for its upkeep, paid its officers no salaries, and charged off nothing for depreciation. It remit-

ted the duty of paying its state and county taxes to the plaintiff. For the rails it uses it has never paid a dollar. This is also true of all its rolling stock and other railway material. Depots, platforms, terminals, and other such attributes of the railway are wholly nonexistent. Its president testified that he did not believe it possible that it would ever pay its operating expenses. He did not think it could be sold. Indeed, he doubted if it could be given away to any one under obligation to continue its operation. He was equally skeptical as to the possibility of bonding the property. The condition of the road and the roadbed is not less calamitous. Generally, its supports are rotten, and in at least one place crossing a stream or other depression, the stringers having rotted away, the passing train is upheld only by the rail.

[1-3] This railroad, it is alleged, has appropriated the rolling stock, steel rails and other railway material of the plaintiff, it is insisted, to the value of $100,000. This bill in equity is brought to obtain a decree directing the restoration of this railway material to the true owner; this, it is insisted, is the Ocmulgee Lumber Company. The bill charges, and the answer admits, that this material was the property of the plaintiff. It had been engaged in the manufacture of pine lumber at Lumber City. Its mills having been destroyed by fire, the plaintiff was left with this material. The bill charges, and the answer admits, that neither the defendant nor any one has paid anything to the plaintiff for this property. It is, however, insisted that the plaintiff's effort to secure redress must be denied, because its property has been dedicated to a public use, in which use it is also alleged the plaintiff has acquiesced. The plaintiff and the defendant, both corporations, could only act in a corporate capacity. It is not pretended that any such corporate action authorized a sale.

It is moreover, plainly apparent from the oral, and particularly from the documentary, evidence that there was no sale of any sort by anybody of the steel rails and other railway material of the Ocmulgee Lumber Company. It is true that there were certain negotiations looking to such sale. The minutes of the defendant company exhibit a resolution authorizing the purchase of this property from C. F. Smith, trustee, for $94,500, if the authority for such purchase should be given by the Georgia Railroad Commission, but no authority was given by the Commission, nor was any application made to the Commission for such authority. For whom C. F. Smith was trustee is gravely in doubt. At one time he testified that he was trustee for his wife; at another, that he was trustee for certain unnamed and unknown promoters of the railway; and at another time, that he was trustee for his sons, and perhaps other relatives, who were to share, to use his expression, in the "cutting of the melon."

Counsel for the defendant, while contending that Smith bought the property, declare they do not know whether it was for himself as trustee, or for himself as president of the Ocmulgee Valley Railway Company. There is, however, not the slightest dispute as to the fact that no purchase money was ever paid or secured. In truth, for a long time C. F. Smith was president of the plaintiff company, and the letters offered in evidence from those interested in that company are

filled with appeals to him to protect them, the company, and Smith himself, from the loss which would result from the improper disposition of this railway material, which was plainly its most valuable asset.

Smith claimed that his purchase was in July, 1915, and for $30,000; yet in August, 1916, he makes a written offer to buy the property, and tenders for it $50,000 of the railroad company's bonds. Time and again, as appears from the correspondence, Smith, sometimes as an officer for the plaintiff, sometimes as an officer for the defendant, was repeatedly notified by those acting for the plaintiff that this rail must not be moved from the premises of the plaintiff. As often he replies that the rail had not been moved, would not be, and that the plaintiff's rights in it should be conserved. All the while Smith was one of the largest stockholders of the plaintiff, the Ocmulgee Lumber Company, a director—most of the time, the president.

Nor does the evidence show such acquiescence on the part of the plaintiff company for the use of its railway material by the defendant as will preclude the former from now insisting on its rights. Acquiescence imports active consent, and is not to be inferred from acts which are doubtful or ambiguous. A fortiori will it not be inferred from the written protest against such use—from an unbroken refusal of compliance? It appears from the evidence that A. L. Taylor, who was the agent for the plaintiff, visited Georgia in the fall of 1915. He then discovered that the plaintiff's rail was being used in the defendant's road. He at once notified the defendant's agents, and, indeed, the public, of his intention to remove the rail. Since that time, and until this suit was filed, the plaintiff has continually insisted that, unless arrangements to purchase its rail were effected, it would be taken up and removed. Even where the railroad has unjustifiably seized the right of way, although the owner may primarily be denied ejectment, yet the courts preserve his right to payment. And said Mr. Associate Justice Cobb in the leading case of Charleston & Western Carolina Railroad Company v. Hughes, 105 Ga. 1, 30 S. E. 972, 70 Am. St. Rep. 17:

"When the amount to be paid to the petitioners is thus ascertained, a decree should be entered, allowing the railway company a reasonable time in which to pay the amount thus found, and upon payment of same the title to the property to vest in the railway company. Upon a failure to pay the same within the time limited, the right of the company to acquire the property should be decreed to be lost, and the writ of possession should issue to enforce the judgment in the ejectment already rendered in the case."

This case was extensively quoted by the Supreme Court of the United States in New York v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820, and a strongly analogous conclusion was reached. Since this ruling is applicable in the adjustment of such a controversy, as to property so indispensable as its roadbed, for how much greater reason should it be held applicable to property movable in its nature, like the rails, rolling stock, and other railway material here involved. Particular rails and particular equipment are not, like the right of way, absolutely essential to railway operation. Other material of this sort may be bought in open market. That the railway company is unable to buy

other material cannot affect the right of the owner to that which the railway has seized and not paid for.

There is, moreover, high authority to the effect that to place rails unpaid for in a railway track does not in a proper case preclude their removal. Hunt v. Bay State Iron Company, 97 Mass. 279. Besides, it appears here that a large portion of the rail for which the suit is brought has not been laid in the defendant's track; that it is still piled up at one of its sidings, and there is but little of the motive power of the plaintiff in the possession of the defendant, which is now in use. It is perhaps fortunate that a decree authorizing the recovery of the values the plaintiffs have in this property, or the property itself, on account of the short and incompleted nature of the projected railroad, will afflict the minimum of loss and inconvenience on the public.

It is, moreover, true that the court may well mistrust the apparent solicitude for the public interest which the defendant with such vehemence asserts. Usually public interests are not well conserved at the instance of those who seize, appropriate, and do not pay for the property of others; and the state, which is the appropriate guardian of the public, is not a party here.

Our conclusion is that the averments of the bill are fully supported by the facts and that the relief sought should be granted. A decree may be taken, referring this cause to the standing master, with direction to him to ascertain and report the rails, rolling stock, and other railway material of the plaintiff appropriated by the defendant, and that he shall also ascertain and report its market value at the time of this hearing. The decree will further provide that when the report of the master shall be filed, and the values found by him approved, in accordance with the practice in equity, the defendant shall be allowed 60 days in which to make payment to the plaintiff, and, in case of failure or refusal of payment of the amount thus found to be due, that the plaintiffs shall be empowered to remove the rails and other railway material, and sell the same conformably to law for the settlement of the amount thus found to be due by virtue of this decree.