UNITED STATES v. SMITH et al.

(District Court, E. D. New York. July 18, 1901.)

EMINENT DOMAIN—ELEMENTS OF DAMAGES—PUBLIC BUILDING ERECTED UNDER LICENSE.

The United States purchased a site for a life-saving station, taking a conveyance from the life tenant, which gave it the right to maintain a building thereon as long as desired, and to remove the same at any time. Owing to injury by the tides, the building erected was subsequently moved back to a new location on the land of the grantor, with his acquiescence, and was there maintained until his death. It was placed on spiles two feet from the ground. *Held* that, being a public building built and maintained under license from the owner of the ground, it remained the property of the United States, and the remainder-men were not entitled to be paid therefor in proceedings subsequently instituted by the government to condemn the land.

Proceedings by the United States to acquire land on Great South Beach, in the town of Brookhaven, Suffolk county, New York.

George H. Pettit, U. S. Atty.

Clarence G. T. Smith (Asa A. Spear, of counsel), for defendants Smith.

THOMAS, District Judge. These proceedings are instituted by the United States to acquire title to lands on which it long since erected wooden buildings, suitable for, and connected with, two life-saving stations. The principal buildings stand on spiles, which rise about two feet above the ground in which they are imbedded. The present question is whether the owners are entitled, upon the appraisal, to be paid for the buildings. In 1876 the United States purchased of Egbert T. Smith two pieces of land, bordering on Great South Bay, Long Island. The deed provides:

"That the said party of the first part, in consideration of the sum of one-hundred dollars lawful money of the United States, does by these presents grant, demise, release, and convey unto the said United States the right to use and occupy all that certain lot of land situate on the south beach of Long Island in the above-named town, county, and state, and thus described and bounded: On the north by the waters of the Great South Bay; on the east, south, and west by lands of Egbert T. Smith, one square acre, the center of which bears S. ½ by compass from Smith's Point, for a building site for Life-Saving Station No. 17, Third district, be the contents what they may, with full right of egress and ingress thereto, in any direction, over other lands of the grantor, by those in the employ of the United States, on foot or with vehicles of any kind, with boats, or any articles used for the purpose of carrying out the intentions of congress in providing for the establishment of life-saving stations, and the right to pass over any lands of the grantor in any manner in the prosecution of said purpose, and also the right to erect such structures upon the said land as the United States may see fit, and to remove any and all such structures and appliances at any time, the said premises to be used and occupied for the purposes named in said act of March 3, 1875, to have and to hold the said lot of land and privileges unto the United States from this date for the purpose aforesaid. And it is further stipulated that the United States shall be allowed to remove all buildings and appurtenances from the said land whenever it shall think proper, and shall have the right of using other lands of the grantor for passage over the same in effecting such removal."

Smith owned a life interest in the land under the will of his father, which terminated upon his death in 1889, and the present claimants, children of Egbert T. Smith, as remainder-men, succeeded to all rights in the land. Before the death of the life tenant, it is claimed that on account of injuries thereto from the rising tides, the original building at Smith's Point was moved back about 200 feet, and its location fixed upon land of which Egbert T. Smith was also life tenant. This removal from the land purchased, if it occurred, took place in 1876 or 1877, and it must be assumed to have been with the consent of the life tenant, and to have been acquiesced in by him, so as to relieve the United States from the position of a trespasser. Smith's house was about two miles distant, and it is impossible to believe that for twelve years he did not visit this portion of his premises, and have full knowledge of the location of the buildings. Indeed, one of the remainder-men—his son—states that he saw the building moved, that he worked in the station six years after its removal, and that his father was, at least on one occasion, at the station after the building was moved. Therefore, as between the.

life tenant and the United States, the building belonged to the United States. Dame v. Dame, 38 N. H. 429, 75 Am. Dec. 195. The question then is, do the buildings belong to the remainder-men, so as to entitle them to compensation therefor? Undoubtedly the United States, at the death of the life tenant, owned the buildings, and was entitled to remove them. The land had been acquired for public purposes by the government, enabled at any time to take the same uninvitum, pursuant to the statutes of the state of New York. The grant by Egbert T. Smith indicates an intention to convey a right to use permanently, if the United States so desired, and the defect of title was curable by condemnation of the outstanding interests. The remainder-men left the United States in undisturbed possession of the property until the spring or summer of 1897, when actions of ejectment were brought by owners of the fee against certain individuals alleged to be in possession of the premises. They were presumptively the men in charge of the station. Thereupon, in January, 1898, after failure to acquire the property by purchase, proceedings were begun similar to those now at bar. These proceedings proved defective, and were discontinued, and the present proceedings were begun in February, 1901.

The court is unwilling to countenance the claim that public buildings of the United States, erected on the land of a life tenant by the latter's consent, became the property of remainder-men, so as to entitle the latter to compensation therefor in proceedings instituted to acquire title. The property had been sought and appropriated for public purposes, and defects in title were curable, if not by voluntary purchase, at least through compulsory proceedings. It would be an intolerable rule that should forfeit to those succeeding to possessory rights structures erected rightfully for public agencies, even though there be laches in acquiring the outstanding title; and such has been the all but uniform holding of the courts. Railroad Co. v. Goodwin, 111 Ill. 273, 53 Am. Rep. 622; Ellis v. Railroad Co., 125 Ill. 82, 17 N. E. 62; Cohen v. Railroad Co., 34 Kan. 158, 8 Pac. 138; Morgan's Appeal, 39 Mich. 675; Justice v. Railroad Co., 87 Pa. 28; Greve v. Railroad Co., 26 Minn. 66, 1 N. W. 816; Railroad Co. v. Armstrong, 46 Cal. 85; Railroad Co. v. Dunlap, 47 Mich. 456, 11 N. W. 271; Lyon v. Railway Co., 42 Wis. 538; Lewis, Em. Dom. § 507. In the case of U. S. v. Land in Monterey Co., 47 Cal. 515, it appears that the United States entered upon land tortiously by ejecting the owners, and erected thereon a stone building, "the foundations of which were set in the soil," and it was held that the building pertained to the land, and was the property of the owner. Such is not the present case. It has been considered generally that the owner is entitled only to just compensation for his property, and that payment for improvements placed upon land appropriated for public purposes would be something more than just compensation. The buildings are not the property of the owners of the land, and they should not be paid for what does not belong to them. This is justice towards the United States. But it also should do justice to the owners, by compensating them for the value of the use and occupation of such premises from the death of the life tenant. It is

not within the power of this court to enforce such payment in this proceeding, but it is within the power and duty of the government to do it.