## UNITED STATES v. FIVE PARCELS OF LAND IN HARRIS COUNTY, TEXAS, et al.

### No. 12572.

United States Court of Appeals, Fifth Circuit.

Feb. 16, 1950.

John F. Cotter, Atty., Dept. of Justice, Washington, D. C., Scott W. Key, Sp. Asst. to U. S. Atty., Houston, Tex., A. Devitt Vanech, Asst. Atty. Gen., and Elizabeth Dudley, Atty., Dept. of Justice, Washington, D. C., for the United States.

Chas. W. Bell, Houston, Tex., Robert F. Campbell, Houston, Tex., W. N. Arnold, Jr., Houston, Tex., Fred Much, Houston Tex., Price Daniel, Atty. Gen. of Texas, and Ben H. Rice, III, Asst. Atty. Gen. of Tex., for appellees.

Before McCORD and WALLER, Circuit Judges, and RICE, District Judge.

WALLER, Circuit Judge.

The only question involved in this case is whether or not the landowners in condemnation proceedings by the United States are entitled to compensation for the increased value to the lands caused by dredging, filling, and leveling of same by the United States while the lands were under lease to it or its agents, prior to the institution of condemnation proceedings.

On February 15, and on April 15, 1941, the lands involved in this suit were leased by the owners to the Houston Shipbuilding Corporation at a stipulated yearly rental. In the leases it was contemplated that some dredging would be done and consent was given to deposit the spoil on the lands. In consequence of this dredging the filling and leveling of the lands were largely incidental. The Shipbuilding Corporation was an agency of the United States and for the purposes of this discussion it will be treated as if it were the United States, since the improvement of the lands, the building of the facilities and improvements, the operation of the shipyard, and the building of ships were all for the United States and at its expense.

The leases were each for a five-year period, with the right of renewal in the lessee for an additional five years, and each provided that at the expiration or termination the United States would be entitled to remove the facilities and improvements which it had placed upon the lands. No one questions the right of the United States to remove structural improvements and facilities, and no attempt is made to obtain payment for such improvements or facilities.

After the execution of the leases the United States went into possession, dredged out an adjacent channel, filled in portions of the lands, and operated a ship-yard upon some of the lands embraced in the leases.

On the 14th of November, 1942, or some 21 months after the execution of the leases, the United States instituted condemnation proceedings for all of the leased lands, and obtained an order of the Court for immediate possession of the lands of which it was already in possession under the leases. Two years later, or on the 21st of October, 1944, the United States filed a declaration of taking and deposited into the registry of the Court the amount which it deemed to be just compensation and thus obtained the fee simple title to the lands.

When a report of commissioners undertaking to fix just compensation was unsatisfactory to the United States the case was brought on for trial. There were submitted to the jury the following special issues that are pertinent to our consideration of the case: (1) the reasonable cash market value of the lands at the time of the making of the lease agreement by the Government; (2) the reasonable cash market value of the lands at the time of the filing of the condemnation suit, excluding all improvements placed on the lands by the Government;[1] (3) the reasonable cash market value of the lands on November 14, 1942, the date of taking, excluding all improvements placed or constructed on the lands by the Government, except improvements resulting from the dredging, filling, and leveling done by the Government. The jury fixed the value as to Parcel No. 1, or the 86.636 acres belonging to the Harris County-Houston Ship Channel Navigation District, and the State of Texas, in answer to the first two questions, at $850 per acre, and fixed the value, in answer to the last question, at $3,000 an acre, and made similar answers, but with different values, as to the other parcels owned by the other defendant. It is not necessary to set out the particular amounts so fixed as to all tracts but only to state that the value found after the dredging, filling, and leveling was considerably above the value as found prior thereto.

Judgments were entered, based upon the value of the land determined by the jury at the time of the taking, excluding facilities and improvements constructed or erected, but including improvements resulting from dredging, filling, and leveling.

The Goverment insists that the Court erred in requiring the Government to pay for the increase in value of the lands caused by expenditures which it had made by dredging, filling, and leveling the land. Although it admits that the dredging, filling, and leveling were permissible under the leases and that such work was done solely for the purpose for which the lands were leased, and although it cannot be disputed that the land upon reversion at the termination of the lease would belong to the landowners in the improved condition, or, that is, with the dredging, filling, and leveling added, and although it did not own the fee simple title at the time of the filing of the condemnation suit, nevertheless, it insists that the landowners should not be paid anything for any fruits of the leases other than the annual rentals. The Government undertakes to support this contention by citing the rule, announced in a number of cases where the condemnor had leased lands with the right to remove any improvements placed by it thereon, that it did not have to pay, upon subsequent condemnation, for such improvements which, concededly, already belonged to it.

We know of no departure, in the decisions, from the rule thus asserted, in all cases where there were stipulations in the leases conferring upon the condemnor the right of removal of such improvements or where the condemnor had in good faith gone upon the lands and erected improvements in the *bona fide* belief that it had the right so to do, or where the circumstances were such that equity ought to hold that the

---

1. On each of these first two issues the jury found that there was no difference in the market value of the land between the date of the making of the leases and the date of the filing of the condemnation suit, excluding the value of the improvements placed thereon before the latter date.

condemnor, who owned the improvements, had the right to remove same.

Appellant also seeks to invoke the doctrine announced in United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55, that where persons acquire land within the area of a project to be undertaken by the United States, with foreknowledge that the land was in the project area to be acquired by purchase or condemnation for the use of the United States, such persons were not entitled to any increase in the value of the land occasioned by virtue of the establishment of the project.

However, we have neither of these conditions here. The United States was not authorized to take back the fill or to undo the leveling or to fill up the dredging. The dredging, filling, and leveling were done in furtherance of the purpose for which it had leased the lands, and were normal, incidental, and contemplated fruits of the leases which rightfully inured to the landowners and reverted to them at the end of the leases. The landowners had the right to receive the land back at the termination of the lease with the structures and facilities removed. But the leveling and filling of the land were not removable improvements within the contemplation and meaning of the provisions in the leases allowing removal by the lessee of facilities or improvements constructed on the lands.

The landowners had the fee title at all times. The United States had title to a leasehold interest or estate for a term of years, which leasehold estate was in the nature of an encumbrance or burden upon the fee simple title of the landowners, and which may or may not have affected its market value.[2] The United States already had possession and the right to retain same for a period of approximately nine years upon the payment of the stipulated annual rental, but the title to the land and the right to receive it back at the end of the leases belonged to the landowners.

That the United States would improve landowners' property by dredging, filling,

and leveling was within the intent, purpose, and contemplation of the parties to the leases; that the United States would spend large sums of the taxpayers' money to disimprove, or unfill, or unlevel the lands upon the termination of the lease is fantastic and unthinkable, and not within the intent of the parties to the leases. The right to receive the lands back with the improvements *to* the lands as distinguished from improvements *on* the lands was a right implied in the leases that inhered in the landowners. This, together with the fee title, the Government condemned and took, and under the Fifth Amendment the landowners are entitled to receive just compensation therefor.

The landowners did not buy into a projected public improvement as in the Miller case. Instead, they owned property that the Government leased as a part of a project under leases that called for the privilege of occupancy of the lands for a term of years—not for the fee simple ownership. The leases were valid contracts and by virtue of which the Government improved and increased the value of the lands in question —not by virtue of the establishment of a project. These contracts being valid and binding, the Government cannot, by determining that it wants to take entire title, abrogate, annul, or set at naught the lawful rights, privileges, and property of its lessees acquired under these contracts.

The judgment is affirmed.

McCORD, Circuit Judge, (dissenting).

The verities involved in this case, as I see them, are whether the obligation of the government to pay "just compensation" to a landowner under the Fifth Amendment for private property condemned to public use, requires the government to compensate the landowner for an addition to the value of the property *created solely by improvements made thereon by the government at government expense.*

It is without dispute that solely by reason of money spent by the government in im-

---

2. The parties do not argue that the encumbrance on the title created by the lease exceeds the value of the rentals receivable under the lease which are eliminated by the condemnation.

proving the condemned property and building a shipyard thereon for the prosecution of the war, the value of the property was increased by $332,297.15, or from $387,800.60 to $720,097.15. Thus, in requiring the government to pay these property owners for this increase in the value of the property brought about solely by the government and at its expense, the court has unjustly penalized the government by awarding more than the "just compensation" guaranteed by the Fifth Amendment. Searl v. School-District No. 2, of Lake County, 133 U.S. 553, 10 S.Ct. 374, 33 L.Ed. 740; Consolidated Turnpike Co. v. Norfolk & O. V. Ry. Co., 228 U.S. 596, 602, 33 S.Ct. 605, 57 L.Ed. 982; United States v. Miller, 317 U.S. 369, 377, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55.

The conclusion of the majority to the effect that the parties did not intend that the government would have the right to nullify the improvements it had made in the dredging, filling, and leveling of the land is not supported by a fair interpretation of the lease contract. The lease clearly reveals that all parties contemplated the government was authorized thereunder to make whatever changes or improvements to the land it found necessary to effectuate and promote the object for which the lands were initially leased and later condemned— the construction of a shipyard to build ships with which to wage war. Moreover, the government had an absolute right under the leases, during the ten year term in which they were supposed to run, to change, nullify, or completely destroy these dredging, filling, and leveling improvements to the land, if it considered such action necessary in the national interest for the more efficient prosecution of the war. It is quite conceivable that some urgent war necessity during the term of government occupancy under these lease agreements, such as an enlargement of the shipyard facilities or otherwise, might have rendered the destruction of the improvements for which compensation is now sought absolutely necessary. How can this court then hold, as a matter of law, that the exercise by the government in its discretion of its undoubted right under the lease to nullify these improvements to the land, during the term of the lease agreement, would have been "fantastic and unthinkable". The majority decision, in effect, penalizes the government not because this right did not exist, but merely for its failure to exercise this right before seeking to condemn the land.

The government could have condemned these lands at the time the leases were executed, and the lease agreements contain nothing to show that, in order to hold on to its large investment, the government would not later exercise its right of condemnation. Old Dominion Land Co. v. U. S., 269 U.S. 55, 65–66, 46 S.Ct. 39, 70 L.Ed. 162; U. S. v. 6.74 Acres of Land, 5 Cir., 148 F.2d 618, 620. Manifestly, this case falls within the orbit of the rule enunciated by our Court of Last Resort in the case of Searl v. School-District No. 2, of Lake County, 133 U.S. 553, 10 S.Ct. 374, 377, wherein it was held: " * * * The occupancy here was in no respect for a private purpose or pecuniary gain, but strictly and wholly for the public use. There could be no presumption that this public agent intended to confer public property upon a private individual * * *."

The equitable doctrine that a condemnor is not obliged to compensate a property owner for an enhancement in the value of property which he has created has long been established. Lyon v. Green Bay & Minnesota Ry. Co., 42 Wis. 538, 544–545; Morgan's Appeal, 39 Mich. 675, 679–680; Greve v. First Div. St. Paul & Pac. R. Co., 26 Minn. 66, 70, 1 N.W. 816; Jones v. New Orleans & S. R. Co., 70 Ala. 227, 233–234; Louisville, N. O. & T. R. Co. v. Dickson, 63 Miss. 380, 385, 56 Am.Rep. 809; Preston v. Sabine & E. T. Ry. Co., 70 Tex. 375, 7 S.W. 825; Jacksonville, T. & K. W. R. Co. v. Adams, 28 Fla. 631, 638, 10 So. 465, 14 L. R.A. 533; Charleston & W. C. Ry. Co. v. Hughes, 105 Ga. 1, 15–18, 30 S.E. 972, 70 Am.St.Rep. 17; U. S. v. Smith, D. C., 110 F. 338, 340; Bear Gulch Placer Mining Co. v. Walsh, D.C., 198 F. 351, 355.

The improvements to these lands were made by the government at government expense solely for public purposes to aid in winning the war, and without any intention

of conferring a financial windfall upon the landowners, if and when the leases were terminated or the lands condemned, by requiring the government to "compensate" these landowners for improvements which cost them nothing and which they had never made. The majority decision holds that the government, having already fulfilled its obligation under the lease by paying substantial annual rentals for the property and the heavy cost of all improvements made thereon, must nevertheless be subjected to the double expense of paying the landowners for the value of government improvements which, under the lease agreement and on the clearest equitable principles, they were never entitled to receive. I cannot subscribe to any such doctrine, which seems to require not only "just compensation", but *unjust enrichment* of private landowners at the expense of the taxpayer and the public purse. In so holding, the majority decision has violated an early mandate of our Supreme Court "to see that it (compensation) is just, not merely to the individual whose property is taken, but *to the public which is to pay for it.*" (Italics mine.) Searl v. School-District No. 2, of Lake County, 133 U.S. 553, 562, 10 S.Ct. 374, 377.

I respectfully dissent.