BURFORD v. UPTON.

5-2112                                    338 S. W. 2d 929

Opinion delivered September 26, 1960.

[Rehearing denied October 31, 1960]

*Spitzberg, Bonner, Mitchell & Hays,* for appellants.

*Carl Langston, Paul B. Pendleton,* and *Moore, Chowning, Mitchell, Hamilton & Burrow,* for appellees.

J. SEABORN HOLT, Associate Justice. This case comes to this court on appeal and cross-appeal from an award of $113,875.00 to appellees, P. C. Upton and wife for certain lands condemned by the City of Little Rock for a dam site and water reservoir known as Lake Maumelle. The City acquired 15,000 acres in all for this project but only 975.4 acres, the property acquired from the Uptons, is involved in this litigation. The Uptons contend that the amount of damages awarded to them by the City was insufficient and the City, on the other hand, contends that, in effect, it paid them too much damages.

The record reflects that shortly after World War II, increased population and industrial growth in the Little Rock area made it apparent that an additional supply of water would be needed to supplement the City's then supply of water from Lake Winona Reservoir. As early as 1947 this need became so apparent that the Little Rock Water Commission employed a firm of engineers to make a study of the possibilities of expanding existing facilities and to determine additional reservoir sites that might be available. Several sites were then considered and a tentative decision was made on another site (called the Congo site) and some land was acquired at that site. The Uptons, as early as 1942, purchased 351 acres in the Maumelle site and acquired additional acreage between 1942 and 1954, prior to the decision of the Waterworks Commission to locate a reservoir in the Maumelle area. In 1945 Upton drilled test holes for a dam position on both sides of the present dam and, during 1947, impounded about 12 to 15 acres of water by building an earthen dam, the purpose being to test the soil under actual reservoir conditions. In 1950 the Uptons employed Max Mehlburger to make a survey to

determine the feasibility of creating a lake by a dam at the approximate location of the Commission's present Maumelle Dam. Mehlburger made an extensive study of the site and concluded that the Maumelle site offered an opportunity to supply a large quantity of good quality water for either municipal or industrial purposes. Three dam sites were suggested in his report, one of which (the Maumelle site) the Commission later acquired through condemnation. After Mehlburger concluded his deductions, Upton began to canvass a number of potential water users, his idea being to build a reservoir and sell water to such users. No successful negotiations were made, however.

Mehlburger was so convinced that the Maumelle River site was the proper one for the City that he asked to be relieved of his employment by the Uptons to be able to present the Maumelle Project on his own to the Commission. Upton acquiesced in this matter and as a result, Mehlburger and Mr. LeFever, another Little Rock engineer, offered to make a report on the Maumelle site for the Little Rock Waterworks Commission without charge. This offer was accepted by the Commission without a commitment, and the report of these two engineers to the Commission caused it to consider seriously for the first time the Maumelle site. Thereafter, after further consideration, the Commission employed an independent engineering firm to make a recommendation of the various sites involved, including the Maumelle site, and the report of this firm overwhelmingly recommended the Maumelle site. A bond issue was floated by the Waterworks Commission to finance the project. About the time construction of the Maumelle Dam was to be commenced, the property owners within the Maumelle area and the Commission had reached no agreement as to the value and extent of the land to be taken. At the request of the Commission, and in order not to delay the construction program, the Uptons, on July 5, 1956, granted the Commission permission to take possession of the lands needed for the dam's construction and when further negotiations failed to bring about an agreement on the price of the land, the Commission filed

suit to condemn the land. The trial court, after hearing voluminous testimony and being favored with extensive briefs by both parties, awarded a total of $113,875.00 to the Uptons for the 975.4 acres of land involved here and, as indicated, both parties have appealed from the decree. For convenience of discussion, the various contentions of the parties have been grouped under separate categories.

*The Dam Site*: It is the rule in this state that private property may not be damaged or appropriated for any public use by any agency, whether state or municipal, without just compensation to the individual. *Ark. Const.* Art. 2, § 22; *Ark. State Highway Comm.* v. *Partain*, 192 Ark. 127, 90 S. W. 2d 968. The generally accepted standard in arriving at just compensation is the fair market value of the property involved. See *Orgel, Valuation under Eminent Domain,* § 17; *Little Rock Junction Ry.* v. *Woodruff,* 49 Ark. 381, 5 S. W. 792. The market value is the value to which the property can best be put, or value for the best use of the property, and not necessarily the use to which the property is presently being put. See *Little Rock & Ft. Smith Railway Co.* v. *McGehee,* 41 Ark. 202; *Orgel, Valuation Under Eminent Domain,* § 30; *Yonts* v. *Public Service Company of Ark.,* 179 Ark. 695, 17 S. W. 2d 886.

In the case at bar it is contended by the Uptons, and denied by the City of Little Rock, that the highest and best use of the land involved below the 290' elevation was for dam site purposes. The gist of the City's argument is that an owner should not be allowed to value his land for the very purpose for which the City wishes to condemn the land. In *Yonts* v. *Public Service Company of Arkansas, supra,* a dam was to be built in the neck of a gorge. The defendant's land extended some distance up the gorge and in the valley. This land was to be used for reservoir purposes. The land owned by the Yonts was adapted for a dam site across a creek. The gorge, having almost perpendicular sides, came to a narrow neck and a creek supplying ample water flowed through the gorge and through the lands owned

by the Yonts. There was other evidence that this was the only suitable place for a dam or reservoir in the area of Booneville. We there said: "* * * the owner had the right to obtain the market value of the land, based upon its availability for the most valuable purposes for which it can be used, whether so used or not. In other words, while the testimony of these witnesses as to the value was admissible, the owners in this case had the right to a judgment for the market value of the land for a damsite and reservoir, and not for agricultural purposes. They had the right to have a judgment for its value based upon its availability as a damsite and reservoir."

Another case is that of *Gurdon & Fort Smith Railroad Co.* v. *Vaught,* 97 Ark. 234, 133 S. W. 1019. The railroad built a roadbed through a gap owned by Vaught. The evidence showed that the defendant's land was the only feasible place the railroad could lay its tracks for the proposed railroad line due to the mountainous terrain. On the measure of damages we said: "* * * The measure of the compensation which the landowner is entitled to recover from a railroad company which has appropriated same for its right-of-way is the market value of the land so taken. In estimating that market value it is perfectly competent to consider the availability and adaptability of the land for the very purpose for which it is taken by the railroad company as an element of value which would attract any buyer for that purpose."

We conclude that it was proper in the present case to consider the value of the land as a dam site for the purposes of condemnation.

*Bloating Clay Deposits*: Up from the dam site and forming the bottom of part of the reservoir is a large acreage of bloating clay from which a lightweight aggregate can be processed and used in the making of building blocks. It is the contention of the Uptons that this clay is extremely valuable and the total award is inadequate because it does not reflect the value of these deposits. On the other hand the City of Little Rock maintains the

deposits were comparatively worthless when viewed in the light of other deposits of a similar nature underlying nearly the entire county. Just a sampling of the testimony will show how hotly disputed the issue **was.**

Mr. Upton, owner of the property in question, stated that he thought the clay deposits were worth $2,055,-000.00 but gave no basis for his opinion. Mr. Bickel, a man of limited experience in the manufacture of lightweight aggregate, testifying for the owner, stated he thought the clay deposits were worth between $754,000.00 if he were representing the buyer and double that figure if he were representing the seller. Mr. Williams, a man engaged in the manufacture of lightweight aggregate in Texas, testifying for the owner, stated he valued the lands at $900,000.00 but on cross-examination revealed that he did not know of the presence of other clays in the county and conceded that the supply might have an effect upon the price paid for land. The last witness for the landowner was Mr. Vaughan, a professional appraiser of extremely wide experience, whose estimate on the value of the clay deposits was $473,000.00.

The following witnesses appeared for the City of Little Rock. Mr. McElwaine, a graduate geologist with many years of experience in locating clay and mineral materials in Arkansas, testified he had investigated the Pulaski County area to determine the availability and supply of bloating clays. On one exhibit alone he showed the presence of 500,000,000 cubic yards of clay, or a 4,444 year supply at the present rate of consumption in the State of Arkansas. A second witness, Mr. Willson, a highly qualified engineer-businessman who has been in the cement and aggregate business most of his life and an engineer acting as vice president of Texas Industries, the largest lightweight aggregate company in the world, whose company operates some 32 plants in the United States engaged in the manufacturing of heavy and lightweight aggregate, ready-mix concrete, concrete pipe, blocks and related concrete lines, testified that in all his experience he had never known of land being purchased for lightweight aggregate purposes other than

on the basis of the going value of the land; meaning the price the land is being offered and sold for in the area without regard to the presence of the clay, — the reason being the abundance of such a clay in the mid-western area of the United States.

In view of the highly conflicting testimony which the chancellor had before him and further in view of the fact that the award was a lump sum so that we cannot tell how much consideration the chancellor gave to the clay deposits in arriving at its value, we cannot say that the award was against the preponderance of the evidence either as being excessive, as argued by the City, or as being inadequate as argued by the Uptons. Incidentally, for the same reason we cannot say the chancellor was wrong in fixing the value of the dam site.

*Value of Land Taken Above 290' Mark*: The Uptons also contend the trial court erred in rejecting certain evidence relative to the value of the land taken above the 290' level because of its alleged enhanced value the lake would create. Again we do not agree. The evidence does not show what amount was allowed for the land taken above the high water mark, or the 290' line. The Uptons further argue that the City condemned and took more land above the 290' elevation than was necessary. We think this contention is without merit. We will not set aside what constitutes an appropriate taking unless there has been an abuse of discretion. See *State Game & Fish Comm.* v. *Hornaday,* 219 Ark. 184, 242 S. W. 2d 342; *Woollard* v. *State Highway Comm.,* 220 Ark. 731, 249 S. W. 2d 564 and *Patterson Orchard Company* v. *Southwest Arkansas Utilities Corp.,* 179 Ark. 1029, 18 S. W. 2d 1028, 65 A.L.R. 1446. However, here there is an abundance of testimony to show there was a necessity to take acreage above the water mark and along the lake front to prevent pollution of the water from possible sewage affluent and contamination from any undesirable farming practices which might be carried on. Also, a preponderance of the evidence shows that the land taken below the dam is necessary for protection of the dam. We cannot

say from a review of the evidence there was an abuse of discretion.

Finding no error, we affirm on both direct and cross-appeal.