STATE, EX REL. PUBLICITY & PARKS COMMISSION *v.* EARL.

5-2309                                    345 S. W. 2d 20

Opinion delivered March 27, 1961.

[Rehearing denied May 1, 1961.]

*Phillip H. Loh,* for appellant.

*Gordon & Gordon,* for appellee.

PAUL WARD, Associate Justice. Incident to a condemnation suit by the Arkansas Publicity and Parks Commission (brought in the name of the State) to obtain a fee in certain lands and a permanent easement in adjacent lands for the purpose of constructing an airport on Petit Jean Mountain, the issues arising related to the amount of compensation and damages due to the landowners.

The factual background preceding this litigation wil be helpful to an understanding of the several questions presented. On January 12, 1954, Billie Earl and his wife executed to Winthrop Rockefeller a 20 year lease on 15.4 acres of land situated in the Southeast Quarter of Section 28, Township 6 North, Range 18 West, on Petit Jean Mountain, for the location and construction of an airport. The exact location and dimensions of the land are shown in a surveyor's plat attached to the lease. Rockefeller paid $500 as rent and as part of the consideration he agreed to sod the runway with bermuda grass and to keep the hay cut and deliver one-half thereof to the lessor; he further agreed to provide necessary artificial drainage, to provide adequate fencing around said property to protect it from cattle grazing in adjoining pastures, to provide a passageway around the southwest end of said air strip for the movement of cattle from one side of the strip to the other, and to preserve adequate roads across the lands. The lease specifically

gave Rockefeller the right to execute an assignment to the "Arkansas State Publicity and Parks Commission, the Morrilton Chamber of Commerce, or other civic groups for the purpose of maintaining a proper air strip as a public service and convenience." Soon after the execution of the lease Rockefeller graded and levelled off the air strip, sodded it with bermuda and made certain other improvements. (It is noted here that the above named Billie Earl did not own the leased lands, actually held and owned by the appellees, but the evidence shows that the money was divided among appellees and no question of ownership has been raised.)

On October 8, 1954, Rockefeller executed an assignment of the said lease to the Arkansas State Forestry and Parks Commission. This commission is now superseded by the Publicity and Parks Commission by virtue of Act 330 of 1955.

On February 7, 1960, appellant filed a complaint in the Circuit Court against Billie Earl, Jr., Billie Earl, R. D. Earl, Jr., and C. H. Earl and their wives, alleging that it was the "owner and or the lessee" of the lands above described, and that it was operating and maintaining upon said land an air strip and airport facilities. It was further alleged that the defendants owned certain other property adjacent to aforesaid lands and located in the Northeast Quarter of the Southeast Quarter of Section 28; the Southeast Quarter of the Southeast Quarter in Section 28; and the Northwest Quarter of the Southeast Quarter in Section 27, all in the Township and Range above set out. The exact location and dimensions of said lands being shown in a surveyor's plat attached to the complaint and made a part thereof. It was further alleged that appellant desired to improve and expand said airport facilities by lengthening and hard surfacing said air strip, and that in order to make said improvements it will be necessary to go upon the property of the defendants and acquire thereon a continuing easement for present and future construction. It was further alleged that, in order to conform with the

Civil Aeronautics Administration zoning requirements, an "easement over a 400-foot-wide strip of territory on each side of the runway is required to keep trees trimmed and prevent obstruction to air navigation." In the prayer of the complaint appellant asked to condemn a fee in a parcel of land consisting of 21.57 acres described by metes and bounds. (It is noted that the above described lands constitute the southwest portion of the landing strip, which is 350 feet wide and runs in a northeasterly and southwesterly direction.) The described lands included the 15.4 acres mentioned in the lease and in addition thereto 6.17 acres lying in the extreme southwest end of the air strip. In the prayer appellant also asked the court to "grant a permanent easement over a 400-foot-wide strip of territory on each side of the said runway to keep trees trimmed and prevent obstruction to air navigation."

On June 3, 1957, appellees filed an "Answer and Claim for Damages," including a general denial of all allegations in the complaint. After setting out the several obligations imposed upon Rockefeller by the terms of the lease, appellees stated that they "fully expected to enjoy the benefits which enured to them under said lease for a period of twenty years and further expected to re-enter the premises at the expiration of the 20 years . . .;" that the improvements belong to the defendants, subject to the lessee's right to use and enjoy them under the terms of the lease for twenty years. Then the appellees asked to recover in the following amounts and particulars:

(a) For the 15.4 acres contained in the original lease, $400 per acre or a total of $6,160.00;

(b) For the 6.7 acres described above at $200 per acre or a total of $1,234.00;

(c) For the permanent easement in the 400-foot strip mentioned above, amounting to 44.12 acres, valued at $200 per acre or a total amount of $8,824.00;

(d)   For severance damages caused by the air strip separating appellees' lands in the amount of $2,000.00;

(e)   For obstruction to natural drainages of $1,000.00;

(f)   For timber that will be destroyed, $500.00;

(g)   Destruction of crops of hay and grass $1,000.00.

In accordance with the above the appellee asked for a total damage of $20,718.00.

On June 10, 1957, appellees filed an "Amendment to Answer and Claim for Damages" in which they state, under Item (c) above that they are entitled to the full market value of 45.01 acres in the amount of $9,002.00.

On September 29, 1958, appellees filed a "Second Amendment to Answer and Claim for Damages" in which, in general, it was alleged that their lands had been used as a stock farm as a unit; that Highway 154 ran approximately one-half mile south of said lands; that a black-topped county road was located to the north approximately one-half mile; that Lake Bailey covered a portion of the lands on the south side; that there was a stock pond on the Southeast Quarter of the Southeast Quarter of Section 28; that said lands were best suited for building purposes; that it is approximately 7,000 feet from the south end of the runway to Lake Bailey; that there was no other place on Petit Jean Mountain which had the advantages of appellees' land for the construction of an airport; that said lands were best suited for an airport and had a value of $500 per acre; that appellees are entitled to the sum of $8,000 for the depreciation of other lands outside of the lands actually taken; that appellant has not obstructed any natural drains, nor has it destroyed any merchantable timber, but appellees are entitled to the sum of $1,000.00 for the loss of hay crops. Appellees ask for a total amount of $42,290. Appellant filed a reply denying all allegations in the Amended Answer.

Upon the issues above set forth a trial was had before the Circuit Judge sitting as a jury. Voluminous testimony was introduced by witnesses for both sides concerning the value of appellees' lands and the several elements of damages that have been heretofore itemized. The trial court with the consent of both sides made a personal inspection of the property involved. At the conclusion of the trial, the trial Judge issued a carefully prepared "Findings of Facts and Conclusions of Law," covering 37 pages in the record. It would serve no useful purpose to reiterate in detail the testimony supporting the trial Judge's findings. However, if necessity requires, we will hereafter refer to portions of the testimony as we discuss the several points relied on by appellant for a reversal on direct appeal and by appellees on cross-appeal. Suffice to say, at this time, that the trial court considered testimony pertaining to the value of appellees' lands based on its use for agricultural, grazing, housing and subdivision, and availability for airport purposes. Some witnesses valued the land as low as $25.00 per acre and others fixed a much higher value. The trial court found the highest value for the land was for the purpose of an airport, and fixed the value at $200 per acre, taking into consideration such matters as severance, access roads and loss of crops. The trial court then rendered judgment in favor of Billie Earl, Jr., in the amount of $9,811.68 with interest thereon at the rate of 6% per annum from July 23, 1960, until paid; and judgment in favor of the other three defendants (Billie Earl, R. D. Earl, Jr., and C. H. Earl) in the sum of $7,376.92, with interest as stated above.

For a reversal appellant relies upon four separate and distinct grounds which we shall now discuss in the order presented in its brief.

1. Appellant states that "The court erred in fixing the valuation of the easement as if it were a taking in fee." It will be recalled that appellant sought to obtain a fee in the 350-foot strip of land to be used for a runway, but asked for only a permanent easement as to the

400-foot strip on each side of the said runway. The trial court concluded that appellant's use of the said strip destroyed permanently all use and benefit to appellees, and therefore that appellees should be paid full value. After careful consideration we have concluded that the trial court was correct. Although the exact issue here presented has never been passed on by our court we do find support for the trial court's determination in the case of *Baucum* v. *Arkansas Power & Light Co.,* 179 Ark. 154, 15 S. W. 2d 399; *Texas Illinois Natural Gas Pipeline Co.* v. *Lawhon,* 220 Ark. 932, 251 S. W. 2d 477; and *Arkansas Power & Light Co.* v. *Morris,* 221 Ark. 576, 254 S. W. 2d 684. In the *Baucum* case above cited, we find this statement: "We adopt the view of the Supreme Court of Tennessee in the case of *Kentucky-Tennessee Light & Power Co.* v. *Beard,* 152 Tenn. 348, 277 S. W. 889, where it was held, after a review of the authorities (which we do not repeat), that, where an electric light and power company, in condemnation proceedings, acquired a permanent easement across the land of another, it became liable for the full value of the right-of-way as if the fee had been taken." In the *Lawhon* case above cited this court said: "Under the law of this State, the owner of land is entitled to be paid the full value of the land embraced within the right-of-way easement, as if the fee had been taken even though the landowner, after the pipe line was constructed, had the right to continue using the surface of the right-of-way for farming or other purposes not inconsistent with the use of the easement." The *Morris* case above cited repeats the citation in the *Lawhon* case. We recognize the general rule to be as stated in *Keith* v. *Drainage District No. 7 of Poinsett County,* 183 Ark. 384, 36 S. W. 2d 59, "that the measure of damages is the difference between the market value of the land before the alleged taking of the land and its value, if any, after that time; . . ." This rule is not necessarily in conflict with the holding in the above cited cases. They appear to be based on the ground that the condemnor theoretically has the right to make complete use of the

land, thereby leaving no valuable use for the owner after the taking. The *Keith* case moreover recognizes the doctrine announced by Mr. Angell in his work on water courses, Section 465, where it is stated "that a serious interruption to the common and necessary use of property is equivalent to the taking of it, . . ."

Applying these announced rules to the case under consideration we are unable to say that there is no substantial evidence to support the trial Judge's findings, as a matter of fact, that appellant's taking destroyed the common and ordinary uses of appellees in the said 400-foot strips. There is no testimony in the record showing the market value of these strips before the taking and the market value of said strips after the taking. The testimony upon which the trial court made its finding was involved and somewhat complicated. It was attempted to show that appellant had exclusive use above certain horizontal planes extending a certain height above a certain point on the runway. There was also testimony indicating that, due to the terrain of the land, the plane would be at different heights above the ground at different points on appellees' land, thus leaving a hopeless state of uncertainty and confusion. There was testimony that the land could be used for raising cattle and testimony to the contrary. It was definitely shown by the testimony that there was great uncertainty as to what extent, if any, appellees would use the lands, and for what purposes. Therefore we conclude that the trial court was correct in rendering judgment for the full value for the said 400-foot strips of land.

2. Appellant next contends: "The court erred in placing valuation for airport purposes." We are not impressed with appellant's argument on this point. The court correctly allowed appellees compensation for the lands based on their best and most valuable use. We have many times announced the rule, reaffirmed in the case of *Burford* v. *Upton*, 232 Ark. 456, 338 S. W. 2d 929, that, in condemnation procedures, the landowner is entitled to be reimbursed for his land on the basis of the

best and most valuable use for which it is suited. There is substantial evidence in the record to support the trial court's finding that appellees' lands were most valuable for use as an airport. The very fact that the lands are now being used for an airport is some indication that they are fitted for that purpose. Also, there is testimony in the record stating that the land's most valuable use was for airport purposes. In view of this the trial court's finding must be sustained.

3. It is also appellant's contention that "The court erred in not permitting the introduction of a comparable sale." We see no merit in this contention. In the first place, the trial court found (and we have agreed) that appellees' lands were best suited for an airport, consequently the value of other lands on Petit Jean Mountain for agricultural or stock raising purposes would have little if any bearing on the value of these lands for an air strip. Also, the record shows the court did allow considerable testimony regarding the market value of lands in that area, and so any additional testimony would have been merely accumulative. If introduced it could have had no bearing upon the findings of the trial court regarding the value of appellees' lands for airport purposes. It would serve no useful purpose to reiterate the testimony relating to this point.

4. Finally appellant contends that "The court erred in declaring zoning ordinance ineffective." The record shows that in January, 1958, the City Council of Morrilton passed Ordinance No. 58-1 purporting to zone appellees' property adjacent to the aforementioned air strip. The council passed the ordinance pursuant to the provisions of Act No. 116 of 1941, which is set out in Ark. Stats., §§ 74-301 to 79-319. The trial court did not hold that the ordinance was invalid but did hold that it "constitutes an unreasonable and arbitrary exercise of the police power afforded by Act 116 of 1941," and that it bore no reasonable relation to the general safety and welfare of the people of Morrilton. We think the trial court was correct in so holding. It is pointed

out that Morrilton is approximately 18 miles distant from the airport here involved, and there is no showing that very many if any people from Morrilton use the airport or that the airport in any way served the people of Morrilton. Section No. 1(2) of said Act 116 states that a city is "served" by an airport if such airport is used for private flying or otherwise as a point of arrival or departure. Also, Section 2 of said act states, in effect, that in order to protect the life or property of users of airports and occupiers of land in their vicinity, and to promote the public health, safety and general welfare, cities are given the power to promulgate zoning regulations with respect to any airport by which the cities are served. Under the record in this case we find nothing to justify the conclusion that said airport served the City of Morrilton or the inhabitants thereof or that it is necessary to promote their safety or general welfare.

*Cross Appeal.* On cross appeal appellees contend that they should have been given judgment for loss of access roads and for the hay which they would have received from the land if the lease agreement with Rockefeller had remained in full force and effect. The trial court, at some length, reviewed the testimony relative to these two items and concluded that it was insufficient to support an award. We have reviewed the testimony and find that there is substantial evidence to support the trial court's findings.

The most serious contention on the part of appellees is that they are entitled to recover an additional sum based on the value of the improvements placed on the lands by Mr. Rockefeller. It is not denied that these improvements amounted to several thousands of dollars. One witness testified that the air strip with the improvements placed thereon had a value of $25,000, and appellees contend that they should have been awarded compensation in that amount. Appellees' argument is that, had the lease agreement remained in effect, they would, at the end of twenty years, have received back the lands with improvements thereon, because the

lease did not give Rockefeller the right to remove the improvements. We have carefully reviewed this contention along with applicable rules of law and have concluded that appellees are not entitled to more than the amount allowed by the trial court as heretofore stated. Our reasons for this conclusion are hereafter set out.

The exact question here presented has not heretofore been decided by this court. Mr. Orgel in his Second Edition on *Valuation Under Eminent Domain,* in Chapter 7, discusses the subject of Valuation of Improvements made by a Condemner on Property Prior to Its Condemnation, after discussing the difficulties presented in cases of this nature, among other things, says:

"Cases of this kind seem to present the court with a dilemma. On the one hand, if the court adheres either to market value or to a value to the owner as the basis of compensation, it must ordinarily refuse to sanction any increased compensation because of the improvements, and it would often be obliged to require a decreased compensation because the improvements have reduced the value of the property both to the owner and in the general market. On the other hand, if the court allows the full value of the property to the taker, it violates its general doctrine that value to the taker is not the proper basis of compensation, and it sanctions a payment to the owner which may be far in excess of any loss which he has suffered because of the premature construction of the improvement."

Following the above the author then says:

"This seemingly hopeless dilemma is avoided in the majority of jurisdictions by the rule that a condemner need not pay for his own improvements when they have been made prior to the act of condemnation."

We think the rule announced in the last quoted section is sound and practical when applied to the facts in this particular case, and in the absence of any pertinent rule

heretofore announced by this court, we adopt it as our own.

The nearest approach we find among our own decisions to the *Orgel* rule is in *Newgass* v. *Railway Company,* 54 Ark. 140, 15 S. W. 188, where we held that the Railway Company (the condemner) did not have to pay the owner for the value of the improvements placed on his land previous to the filing of the condemnation proceedings. It is admitted here that the air strip was improved before suit was filed by appellant. It might be argued here that Rockefeller is not the condemner, but we think that makes no difference. He had a right under the terms of the lease to assign it to appellant, and appellees are bound to know the land would be used as an airport. In our opinion appellant has every right in this litigation that Rockefeller would have had if he had instituted the litigation.

The peculiar facts of this case illustrate how the *Orgel* rule avoids the "dilemma" referred to by him. If appellees are to be given an award based on the value of the improvements then appellant would be entitled to credit for the value of the 20 year lease. Neither of these items were developed with that degree of certainty as to form a reasonable basis for a definite determination as to value. The trial court, both as judge and jury, heard all the testimony (the Judge personally viewed the property) and reached a conclusion as to the value of all the lands based on its most valuable use, as an airport. In reaching that conclusion the trial court had the right to, and so far as we know actually did, take into consideration all elements, including the ones above mentioned, affecting the proper compensation due appellees. On the whole, we are not willing to substitute our judgment for that of the trial Judge or say that his findings are not supported by substantial evidence.

Accordingly the judgment of the trial court is affirmed on both the direct and cross appeal.