STATE of Alaska, Petitioner,

v.

TELLER NATIVE CORPORATION,
Respondent.

No. S–6160.

Supreme Court of Alaska.

Aug. 25, 1995.

Rehearing Denied Nov. 20, 1995.

E. John Athens, Jr., and Mason Damrau, Assistant Attorneys General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for petitioner.

Bryan P. Timbers, Larson, Timbers & Van Winkle, Inc., Nome, and Robert John, Law Offices of William R. Satterberg, Jr., Fairbanks, for respondent.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

MATTHEWS, Justice.

The State condemned land owned by Teller Native Corporation (TNC). At the time of the condemnation, the State leased the land from TNC and operated an airport on it. The airport was built by the State during the lease with the use of federal funds. We granted review on the question of whether TNC is entitled to compensation for the improvements erected by the State during the term of the lease.

## I. FACTS AND PROCEEDINGS

On March 15, 1972, the State applied to the Bureau of Land Management (BLM) under 49 App. U.S.C. §§ 211–14 for an airport lease on 403 acres of land located outside the Native village of Teller. This land had previously been withdrawn "from all forms of appropriation" for selection by the village under the Alaska Native Claims Settlement Act (ANCSA). 43 U.S.C. § 1610(a)(1) (1988). On March 15, 1973, BLM granted the State a twenty-year airport lease on the land.

On August 7, 1974, TNC filed a village selection application which included the lands encompassed by the airport lease. The surface estate of this land was conveyed to TNC

on January 15, 1982.[1] The conveyance to TNC was subject to the airport lease. BLM waived administration of the lease on March 8, 1983.

After receiving the airport lease, the State constructed an airport, including an access road, parking apron, taxiway, and runway, on the leased land. Construction was completed in 1975 at a cost of $536,890. Approximately ninety-four percent of this amount came from an FAA grant, and the remainder came from state funds. Prior to the condemnation, the airport was further improved with a $174,804 municipal grant for airport lighting and an electrical equipment building and by a state expenditure of $95,634 for a powerline to the airport.

On October 17, 1989, the State filed a declaration of taking condemning two parcels of land totaling 94.105 acres and including the Teller airport and the access road. The superior court confirmed the taking on December 18, 1989. TNC and the State then filed cross-motions for summary judgment concerning whether TNC was entitled to compensation for improvements made to the land during the period of the lease to the State. The superior court granted TNC's motion and denied the State's motion, ruling that the State breached the lease by condemning the property, vesting title in all improvements in TNC. The State petitioned for review, and we granted review.

## II. *STANDARD OF REVIEW*

In reviewing a grant of summary judgment we independently determine "whether there was a genuine issue of material fact and whether the moving party was entitled to judgment on the law applicable to the established facts." *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985) (citing *Brock v. Alaska Int'l Indus.,* 645 P.2d 188, 190 n. 6 (Alaska 1982)). Neither party claims that there are any material issues of fact. The proper measure of compensation for the taking presents a question of law, to which we apply our independent judgment. On reviewing questions of law, we adopt "the rule of law that is most persuasive in light of precedent, reason, and

policy." *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979). The trial court's decision on a motion for summary judgment may be upheld on any ground which, as a matter of law, would support the result reached. *Carlson v. State,* 598 P.2d 969, 973 (Alaska 1979).

## III. *DISCUSSION*

Article I, section 18 of the Alaska Constitution provides, "Private property shall not be taken or damaged for public use without just compensation." We liberally construe this provision in favor of the property owner. *Ehrlander v. State, Dep't of Transp.,* 797 P.2d 629, 633 (Alaska 1990). "In Alaska, the fundamental goal of 'just compensation' is to make the property owner whole." *City of Kenai v. Burnett,* 860 P.2d 1233, 1242 (Alaska 1993). "[T]he property owner should be placed as fully as possible in the same position as he was in prior to the taking of his property." *Ketchikan Cold Storage Co. v. State,* 491 P.2d 143, 150 (Alaska 1971). "[J]ust compensation is determined by what the owner has lost and not by what the condemnor has gained." *Gackstetter v. State,* 618 P.2d 564, 566 (Alaska 1980). Therefore, this court must determine what TNC has lost by virtue of the State's condemnation of the airport lands.

### A. *Compensation Should be Paid for Any Improvements Which TNC Owned Under the Lease.*

The State claims that just compensation does not include the value of improvements made by the State as lessee because TNC did not contribute to the improvements and because a condemning authority should not pay for its own precondemnation improvements.

The State's argument that TNC is not entitled to compensation for the improvements because it did not contribute to them is incorrect. A condemnee is entitled to compensation based on what it has lost, *id.* at 566, not based on its contributions to what it lost. In addition, in the transfer of the land to TNC, TNC succeeded to the interests of

---

1. TNC subsequently received the subsurface deed from Bering Straits Native Corporation.

the United States in the land. 43 U.S.C. § 1613(g). As a result, TNC should be considered to have paid whatever consideration for the improvements the United States paid. The requirements in the lease that the State construct an airport on the site, the nominal rent paid under the lease ($10 a year), and the State's use of free fill from other BLM land (also selected by TNC) for improving the airport may be considered consideration for the non-removable improvements paid by the United States as lessor.

The State's primary argument—that a condemning authority should not pay for improvements on the property it made as lessee—is supported by some precedent. In *State v. Earl,* 233 Ark. 348, 345 S.W.2d 20, 26 (1961), the court rejected the landowner's claim for compensation for improvements placed on the land by its original lessee, who subsequently assigned his interest to the condemning authority. The landowner originally leased the premises to another private individual for use as an airport. The lease required the lessee, *as consideration for the lease,* to sod the runway, provide necessary artificial drainage, construct fencing, and make other improvements. *Id.,* 345 S.W.2d at 21–22. The State conceded that the improvements made by the original lessee "amounted to several thousand dollars," and one witness testified that the improvements had a value of $25,000. *Id.,* 345 S.W.2d at 26. The lease did not grant the lessee any right to remove the improvements. *Id.* The landowners claimed that they were entitled to compensation for the improvements because they had a reasonable expectation that they would receive them at the expiration of the lease. The court rejected this claim, holding that "a condemnor need not pay for his own improvements[2] when they have been made prior to the act of condemnation." *Id.* (quoting 1 Lewis Orgel, *Valuation under the Law of Eminent Domain* 409 (2d ed. 1953)).

In the sentence quoted by the court, Orgel is discussing condemnors who are technically trespassers. In a footnote to this sentence Orgel states:

A somewhat analogous situation is presented where a lessee who has improved property subsequently condemns it. If the lessee has the right to remove the improvements, the lessor is of course not entitled to be compensated for their value nor is cost of removal taken into consideration since this does not increase the value except to the condemnor. But where the lessee has no right to remove the improvements, their value is properly taken into account, for in this case the lessor has by contract a right to the improvements on termination of the lease.

1 Orgel, *supra,* at 409 n. 1 (citations omitted). Orgel thus draws a distinction between pre-condemnation improvements made under a contract giving the landowner the right to keep improvements—in which case the condemnee gets compensation for the improvements—and pre-condemnation improvements which are made under a contract not allowing the lessor to retain improvements or which are made by a "trespassing" condemning authority. The Arkansas Supreme Court purported to rely on Orgel but did not follow this distinction; therefore, its decision in *Earl* is questionable.

The distinction drawn by Orgel is a reasonable one. There is a difference between improving property under the mistaken belief that one has good title to it and improving property under a contract which specifically assigns the right to improvements to another party. As noted above, we have defined "just compensation" in terms of what the owner has lost. *Gackstetter,* 618 P.2d at 566. Where the condemning authority improves property under the mistaken belief that it owns the property or even with the intention to condemn the property immediately, the owner of the property has not lost anything by virtue of the premature construction. However, where the State specifically agrees to build improvements on leased property and leave them there at the termination of the lease, but subsequently condemns the property before the expiration of the lease, the owner of the property will lose

---

**2.** The court held that the State had "every right in this litigation" that the original lessee would have had. 345 S.W.2d at 26.

his reasonable expectation of receiving the improvements at the end of the lease.[3]

■ A number of cases have recognized the rule that the lessor's right to compensation for improvements built by the condemning authority/lessee is controlled by the terms of the lease. In *United States v. Certain Space in Rand McNally Bldg.*, 295 F.2d 381 (7th Cir.1961), the United States entered into a lease which provided that the lessee would retain removable improvements but could not remove structural improvements. After making structural improvements, the United States condemned the building. The court stated that the rights of the parties were controlled by the terms of the lease. *Id.* at 383. The court concluded that the non-removable improvements "became the property of the landowner by the contract of the parties and the property rights of the landowner therein were taken and extinguished by the government's exercise of its power of eminent domain." *Id.* at 384.

In *United States v. Five Parcels of Land*, 180 F.2d 75 (5th Cir.), *cert. denied*, 340 U.S. 812, 71 S.Ct. 39, 95 L.Ed. 597 (1950), the United States leased land for the purpose of constructing a ship-building facility. To this end, the United States dredged a channel, filled and leveled portions of the land, and constructed structural improvements and facilities on the land. *Id.* at 75–76. The leases provided that the United States retained the right to remove facilities and improvements which it placed upon the land. *Id.* at 75. The landowners did not seek compensation for any removable improvements or facilities. *Id.* They did, however, seek compensation for the increased value of the land which resulted from the dredging, filling, and leveling. The court held that as the United States was not authorized to take back the fill, undo the leveling, or fill what had been dredged, the dredging, filling, and leveling were "normal, incidental, and contemplated fruits of the leases which rightfully inured to

the landowners." *Id.* at 76–77. In making this determination, the court relied on the terms of the leases. The owners were thus entitled to compensation for the value of the land as improved.

Similar results were reached in *United States v. 52.67 Acres of Land*, 150 F.Supp. 347 (E.D.Ill.1957), and *United States v. Certain Parcels of Land*, 90 F.Supp. 27 (W.D.Va. 1949). In *52.67 Acres*, the court denied the landowner compensation for fixtures and structures affixed by the government lessee because the lease provided such fixtures and structures remained the property of the government and could be removed by the government at the end of the lease term. 150 F.Supp. at 349–50. The court also determined, however, that "the grading, leveling, altering, and changing of the surface of the ... real estate could and should be considered as 'fruits of the lease' and as becoming a part of the real estate and inuring to the benefit of the lessors." *Id.* at 351. In *Certain Parcels*, the lease provided that the government had the right to improve the property and that "[a]ll such alterations, additions, structures, fixtures, and improvements except walks, service driveways, underground utilities (and appurtenances), and roads shall be and remain the property of the Government and may be removed from the premises by the Government." 90 F.Supp. at 29. The court concluded that on the subsequent condemnation of the property, the landowner was entitled under the lease to compensation for the property as improved with walks, service driveways, underground utilities, and roads. *Id.* at 33–34.

■ The State argues that giving Teller compensation for the improvements would require the government to pay twice for the same thing, resulting in a windfall to Teller. While this "windfall" argument may have merit in the context of premature construction by a trespassing condemnor, *see Anderson–Tully Co. v. United States*, 189

---

3. The State relies on some cases which stand only for the proposition that the condemning authority need not pay compensation for improvements built by it prior to condemnation. *See Searl v. School Dist.*, 133 U.S. 553, 10 S.Ct. 374, 33 L.Ed. 740 (1890); *Etalook v. Exxon Pipe-* *line Co.*, 831 F.2d 1440 (9th Cir.1987). These cases are distinguishable because they do not specifically address improvements built during the term of a lease which explicitly or implicitly gives the landowner the right to keep the improvements at the end of the term of the lease.

F.2d 192, 197 (5th Cir.), *cert. denied,* 342 U.S. 826, 72 S.Ct. 47, 96 L.Ed. 624 (1951), it is not relevant where the pre-condemnation construction was governed by a contract between the parties. No windfall exists where the government has voluntarily entered into a contractual relationship with the landowner rather than condemning the property initially, and has either explicitly agreed to build improvements as part of the consideration for the lease or has, without contractually reserving its right to remove improvements, made improvements that cannot be easily removed.[4] As the court in *Certain Parcels of Land* stated in response to a similar windfall/pay twice argument:

> A brief answer to this argument is that it ignores entirely the obligation which the Government undertook with respect to the improvements when it entered into the lease. No doubt had the Government acquired the fee in this tract in 1944, when it was unimproved, the cost of it would have been much less than it is now required to pay. But instead it decided to lease the land under a contract whereby, in consideration for its use, it enhanced the value of the property. Having now at this later time decided to acquire the absolute title

to the property, it is not "ridiculous" nor is it unjust that it should pay its present value.

90 F.Supp. at 34.

### B. *Who Owned the Improvements?*

TNC's right to compensation for the improvements placed on the land by the State prior to the condemnation therefore depends on which party owned the improvements under the lease. *See* 51C C.J.S. Landlord & Tenant § 394(1)(a) (1968) ("[T]he ownership and right to remove improvements placed on the leased premises by a tenant are determined by the intention of the parties as evidenced by the terms of the lease and the circumstances of the case."). Unfortunately, the lease does not directly address this question, and the unusual circumstances leading to the landlord-tenant relationship between TNC and the State[5] make divining the intention of the parties more difficult.

The airport lease, originally entered into between BLM and the State, provides for a twenty-year term. The State was granted a preference right if at the end of that time the lessor determined that a new lease would be granted, but the lessor was not required to

---

**4.** Where the lease is silent, the tenant may remove improvements at the termination of the lease only if the leased property can be restored to its former condition within a reasonable time of the termination of the lease. *See* Restatement (Second) of Property (Landlord and Tenant) §§ 12.2–.3 (1976); *see also Interior Energy Corp. v. Alaska Statebank,* 771 P.2d 1352, 1356 (Alaska 1989). No reason is apparent why the government, when acting as a lessee, should be subject to a different default rule than a private tenant, where either may arrange for increased protection in the lease.

**5.** As the original parties to the lease, the United States and the State of Alaska, were both governmental entities concerned primarily (it would appear) with providing for public need and not with dividing economic advantages between them, it is especially difficult to discern their economic intentions.

The State argues that because TNC did not claim the lands until after the lease, because the parties did not consider TNC's potential interest in the lease, and because, had the United States remained lessor, the lease probably would have been renewed, TNC had no reasonable expectation of ever owning the improvements. However, TNC's reasonable expectations should not be

based either on any third party beneficiary theory or on the assumption that the United States continues to administer the lease. TNC is an assignee of the United States' interest in the lease, and therefore has all rights in the lease that the United States would have. However, it is a private party, and it was not obligated to make decisions on renewal in the same manner the United States would have. Therefore, once it received an interest in the land, it could reasonably expect to receive the benefits of any improvements on the land that the State would have been required to leave behind at the expiration of the lease, even if it could also expect that the State would, in fact, condemn the property before that time.

The State also argues that TNC had no expectation of ever receiving the land because it was required to convey the land to "any Municipal Corporation in the Native village," 43 U.S.C. § 1613(c)(3). This section does not necessarily require that airport lands be conveyed to the municipal corporation where, as here, it is not land "on which the Native village is located." The option to select land needed for community expansion, rights of way, and other needs is granted to the City of Teller, but unless this option is exercised, the village remains the owner.

offer a new lease. In section 3(d), the lease provides:

That upon the termination of this lease, by expiration or forfeiture, or whenever the United States may claim the right of possession as herein provided, the lessee agrees to surrender to it possession of the premises and to comply with such provisions and conditions respecting the removal of improvements and equipment on the property as may be made by the lessor.

This provision appears to imply that the State, as lessee, retained the right to remove all improvements, subject only to whatever reasonable conditions might be placed on this right by the United States as lessor. However, the right of possession which the United States may claim under the lease clearly anticipates the continued use of the premises by the United States as an airport. Under the lease the State is required to establish and maintain a public airport which meets federal requirements and which federal agencies may use without charge or restriction. The Secretary of Defense may assume control of the airport at any time when doing so is deemed necessary for military purposes. The United States paid ninety-four percent of the cost of the airport and permitted gravel to be extracted from federal land for its construction free of charge. All of these factors indicate a federal interest in the airport which is not limited to the twenty-year lease term.

 TNC also argues that the improvements made by the State were not removable because they were required by the terms of the lease and thus were contemplated "fruits of the lease." Improvements may be denied the status of a removable trade fixture belonging to the lessee and treated as belonging to the lessor if the lease specifies as part of the tenant's consideration for the lease that he will construct certain improvements on the property. 5 Richard R. Powell & Patrick J. Rohan, *Powell on Real Property*

¶ 653, at 57–54 (1994). The lease between BLM and the State does provide:

For and *in consideration of the foregoing,* the lessee hereby agrees: (a) To establish a public airport on such tract and to maintain such airport during the life of this lease.

(Emphasis added.) While it is clear that the State was required to build and maintain an airport during the terms of the lease, this term, by itself, does not necessarily require the State to *leave* a developed airport at the expiration of the lease. However, given the fact that the lease anticipates at least the possibility that the United States would operate the property as an airport at the termination of the lease with the State, and given that no additional consideration is given to the State for improvements seized at that time, it is reasonable to interpret the lease as making improvements "fruits of the lease." In addition, because removal of most of the improvements involved in this case would probably be quite costly, it also seems probable that, at the end of the lease term, complete removal of these improvements would not have been a reasonable removal term.[6]

 This interpretation of the lease is similar to the one made in *Five Parcels,* 180 F.2d 75. That lease provided that the United States would be entitled to remove facilities and improvements which it placed on the land. Nevertheless, the court concluded that dredging, filling, and leveling of the land— improvements which could not be removed and which were essential to the use of the land anticipated under the lease—were "normal, incidental, and contemplated fruits of the leases which rightfully inured to the landowners" at the end of the leases. *Id.* at 77.

That the United States would improve landowner's property by dredging, filling, and leveling was within the intent, purpose, and contemplation of the parties to the leases; that the United States would spend large sums of the taxpayers' money to disimprove, or unfill, or unlevel the lands upon the termination of the lease is

---

**6.** In other words, if the same lease was between two private individuals and, at the end of the term, the lessor sued the lessee for the cost of removing the runway, access road, parking apron, and taxiway, and returning the land to

tundra, it seems likely that the lessee could successfully defend on the ground that removal of these substantial changes to the land would not be a reasonable removal term.

fantastic and unthinkable, and not within the intent of the parties to the leases. *The right to receive the lands back with the improvements to the lands as distinguished from the improvements on the lands was a right implied in the leases that inhered in the landowners.*

*Id.* (emphasis added).[7] Similarly, the lease between BLM and the State is most reasonably interpreted as granting the State the right only to remove removable improvements and as reserving for the lessor the right to other improvements as "fruits of the lease."[8]

## IV. CONCLUSION

TNC's right to compensation is determined by what it was entitled to as successor in interest to the United States under the terms of the lease. Although the lease is ambiguous, on the whole, it is best interpreted as allowing the lessor to retain all unremovable improvements. Therefore, TNC should be compensated based on its ownership interest in the land as an airport with a runway, access road, parking apron, and taxiway.

RABINOWITZ, Justice, dissenting.

The federal-state lease which gave rise to this appeal is a unique circumstance which does not fit neatly within our eminent domain jurisprudence. I dissent because I believe that prior case law does not compel us to conclude that TNC must be compensated for the value of the improvements on the airport property, and that policy dictates otherwise.

The majority opinion cites numerous cases in which a government lessee was required to compensate a private landowner-lessor for improvements made during the course of the lease. In these cases, the government entity builds nonremovable improvements and then condemns the leased property. In awarding compensation, the court, either from express lease terms or based upon the circumstances, determines that the parties intended that the improvements were part of the lease price.[1] In such circumstances, compensation is appropriate for two reasons. First, the government entity could have condemned the property and then made the improvements. However, having chosen not to do so, the government should be required to fulfill its end of the bargain.[2] Second, in setting the lease price for the unimproved property, the landowner has set the price with the expectation that it will receive the benefit of the improvements at the termination of the lease term. Thus, by denying compensation for such improvements the court would be deny-

---

7. The reasoning of *Five Parcels* was criticized in *United States v. Delaware, Lackawanna & W. R.R. Co.*, 264 F.2d 112, 117 (3d Cir.), *cert. denied*, 361 U.S. 819, 80 S.Ct. 63, 4 L.Ed.2d 65 (1959), where the court stated:

> That the lessee for practical considerations of cost would not have removed the new roof and windows, torn up new floors and paving, nor taken out new plumbing all in order to effect a restoration to the original state is irrelevant to this proceeding. What the reversioner would in all probability have gotten at the end of the term is not entirely pertinent in evaluating the property; rather, it is what the reversioner was entitled to as of right at the end of the term. With most respect we think that the Fifth Circuit panel which decided [*Five Parcels*] ... reached an erroneous result by failing to take this consideration into account, and so we decline to follow that decision.

Had the *Five Parcels* court based its decision solely on the practical difficulties of removing the improvements to the land, we would join in the criticism. Where a lease clearly reserves the right to remove all improvements to the lessee, the lessee should retain title to those improvements in spite of any practical difficulties in

removing them. However, in *Five Parcels,* the court looked to the practical difficulties of removing the improvements—improvements which were required as part of the lease—as an indicator of the parties' intentions in entering the lease. Where a lease anticipates improvements to the land by the lessee which could not feasibly be removed and does not clearly address each party's rights in those improvements, it is a reasonable *interpretation of the lease* that the improvements will be left behind as fruits of the lease. *See also 52.67 Acres,* 150 F.Supp. at 351.

8. This result is also supported by the Restatement's rule that additions to property may not be removed at the termination of the lease by the lessee unless the property can be restored to its former condition within a reasonable time of the termination of the lease. *See supra* note 4. In this case such restoration is not a practical option.

1. *See United States v. Certain Space in Rand McNally Bldg.,* 295 F.2d 381, 383 (7th Cir.1961).

2. *See United States v. Certain Parcels of Land,* 90 F.Supp. 27, 34 (W.D.Va.1949).

ing part of the "rent" which the landowner is due.

Neither of these factors are present in this case. First, the State was unable to condemn the property because it was federal land and was subject to selection under Alaska Native Claims Settlement Act.[3] Thus, if the State wished to go ahead with the construction of an airport, a lease was the only property arrangement which was available. Second, I conclude that in view of the totality of the circumstances, the construction of improvements on the property as required by the lease was not part of the "rental price" for use of the property. The terms of the lease, including its twenty-year duration and the renewal provision, were prescribed by federal regulations.[4] Additionally, the nominal $10 yearly rental fee, rather than being in exchange for the improvements at the end of the lease period, was more likely the result of federal policies favoring the development of airfields in outlying locations. The federal government financed most of the initial cost of building the airport through an FAA grant. It would have been a self-defeating proposition to with one hand give an FAA grant to build the airport, while with the other to take back a portion of this money as rental payments for the land on which the airport was built.

Nor do I believe that the federal government perceived these improvements as "fruits of the lease." The lease is silent as to the ownership of the improvements at the termination of the lease. The majority reasons, however, that the transfer of the improvements at the end of the twenty-year term is an implicit provision of the lease. The majority also argues that several of the lease terms demonstrate that the federal government had an "interest in the airport which is not limited to the twenty-year lease term."[5] I disagree. These terms permitted the federal government to use the airport,

and to take it over in the case of a military emergency. I concede that the federal government had an interest in the existence of an airport at Teller, but not necessarily a federal airport. These interests are consistent with continued operation of the airport by the State, and the renewal provision giving the State a preference suggests that this was the arrangement which the federal and state governments foresaw. Thus, I conclude that the construction of the improvements was not a part of a bargained-for exchange, and that the federal government had no expectation of taking over the airport at the termination of the lease.[6] Because the federal government had no such expectation under the lease, neither could TNC.

In short, the federal and state governments build airports in remote locations to benefit nearby populations. The public has financed this effort at Teller once in the form of federal taxes which went toward the FAA grant. Now, the majority would have the public pay for these improvements a second time as a result of the State's condemnation. TNC is being compensated as a result of federal and state laws and policies which led to the development of an airfield near Teller and has given up virtually nothing.[7] I therefore conclude that TNC need not be compensated for the value of the improvements.

AFFIRMED.

---

3. 43 U.S.C. § 1610(a)(1) (1988).

4. 43 C.F.R. § 2911 (1973).

5. Majority Opinion at 853.

6. In other words, I would distinguish the prior lease cases cited by the majority because they

were commercial exchanges rather than intergovernmental land transfers.

7. The State's valuation of the unimproved property is approximately $40,000, while the value of the improvements is approximately $800,000.